THE SEATTLE.

(Circuit Court of Appeals, Ninth Circuit. May 3, 1909.)

No. 1,615.

1. JOINT ADVENTURES (§ 7*)—RIGHTS AS TO THIRD PERSONS.

Where W., with his associates, interested in a dredging contract, contracted for the construction of a dredge, and W. expressly authorized his associates to obtain money from a bank to build the dredge and to mortgage it as security, and he was in charge of the work in which the dredge

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

was used, he was charged with actual notice of the mortgage, whether recorded or not.

[Ed. Note.—For other cases, see Joint Adventures, Dec. Dig. § 7.*]

2. JOINT ADVENTURES (§ 7*)—POWER COUPLED WITH INTEREST—REVOCATION.

Where a party to a contract for the construction of a dredge, to be used in performing a dredging contract in which he was interested, authorized his associates to borrow money to build the dredge and to mortgage it for that purpose, such authority constituted a power coupled with an interest, which was not subject to revocation.

[Ed. Note.—For other cases, see Joint Adventures, Dec. Dig. § 7.*]

3. JOINT ADVENTURES (§ 7*)—MORTGAGE—EXECUTION.

Where one of the parties to a contract for the construction of a dredge, to be used in certain dredging operations in which he was interested, gave his associates power to build the dredge and mortgage it for loans for that purpose, a mortgage executed pursuant to such power was binding on him, whether his signature was attached thereto or not.

[Ed. Note.—For other cases, see Joint Adventures, Dec. Dig. § 7.*]

4. BANKS AND BANKING (§ 261*)—NATIONAL BANKS—EXCESSIVE LOAN—EFFECT.

W., having expressly authorized the mortgaging of his interest in a dredge to secure money to build it and to carry out a dredging contract, also knew that a national bank was financing the building of the dredge, and that the amount necessary exceeded $60,000. *Held*, that W. or his assignee could not object to a chattel mortgage executed to the bank for advancements in excess of one-tenth of its capital stock, in violation of Rev. St. U. S. § 5200 (U. S. Comp. St. 1901, p. 3494); there being no penalty imposed on a national bank for violation of such section, unless it be a forfeiture of its charter, as provided by section 5239.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 261.*]

5. CHATTEL MORTGAGES (§ 138*)—FUTURE ADVANCEMENTS.

Where by the terms of a first chattel mortgage it was made optional with the mortgagee whether to make or refuse future advancements, which the mortgage provided it should secure, such future advancements were within the lien of the mortgage and prior to that of a second mortgage, if made by the first mortgagee without actual notice of the second incumbrance, which is not imported by the recording of the second mortgage.

[Ed. Note.—For other cases, see Chattel Mortgages, Cent. Dig. §§ 228–236; Dec. Dig. § 138.*]

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington.

On December 12, 1899, the Seattle Bridge Company, a copartnership consisting of H. T. McPherson and D. McL. Brown, as party of the first part, entered into an agreement with Alexander Watt, party of the second part, in contemplation of the award to the parties thereto of a dredging contract in the harbor of Everett, Wash., for which they had submitted bids. By the terms of the agreement it was provided that, in case said dredging contract should be so awarded to said parties, a dredger should be built, embodying the invention covered by the United States patent issued to A. B. Bowers, which invention the said Watt claimed to have the right to use, and it was agreed, further, that the said Watt should have the charge and supervision of the contract, and that the profits thereof should be shared between the said parties, two-thirds to the Seattle Bridge Company and one-third to Watt, and that of the dredger forty-nine hundredths should belong to the bridge company and fifty-one hundredths to Watt. The agreement contained the following express provision: "It is further agreed that the said first party shall have the right to hypothecate, by mortgage or other suitable instrument in writing, all interests of both parties hereto in any dredger constructed as aforesaid to the First National Bank of Seattle, or such other corporation, person, or persons as

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

may furnish money for building said dredger or for carrying out such dredger contract, to secure to such bank, corporation, person, or persons the repayment of all moneys so advanced. And the said second party hereby constitutes the said party of the first part, by its managers, H. T. McPherson and D. McL. Brown, his attorney in fact, to make, execute, and deliver in the name and behalf of said second party any instrument necessary or proper for the purpose." On July 24, 1902, a bill of sale, intended as a mortgage of the dredger, was executed to the First National Bank of Seattle, and signed by D. McL. Brown, W. A. Brown, D. A. Brown, and C. M. Nettleton, who then composed the copartnership of the Seattle Bridge Company, and to the bill of sale the name of Alexander Watt was signed by D. McL. Brown as attorney in fact. There was attached to the bill of sale an affidavit, in compliance with the laws of the state of Washington, sworn to by all the parties whose names were appended thereto, save and except Alexander Watt. On July 25, 1902, the bill of sale was filed of record in the Miscellaneous Records of the office of the auditor of King county, Wash., and on January 5, 1903, a certified copy thereof was recorded in Miscellaneous Records of the auditor of Snohomish county, and on January 21, 1905, a certified copy was filed in Miscellaneous Records of the office of the auditor of Pierce county, and on January 21, 1905, a certified copy was recorded in the Records of Chattel Mortgages of the office of the auditor of Pierce county.

On December 31, 1901, the Seattle Bridge Company had borrowed from the First National Bank of Seattle $55,517.35. At the date of the bill of sale the debt had been reduced to $50,517.35. Subsequently it was further reduced, so that on August 29, 1904, it was $24,517.35. Thereafter other loans were made by the bank to the copartnership, and other payments were made on the debt by the copartnership. On February 25, 1903, Watt sold to the Seattle Bridge Company his interest in the dredger, and took in payment thereof three notes, of $9,166.66 each, secured by a chattel mortgage on the dredger. The mortgage was duly executed and recorded on April 25, 1903, in the Records of Chattel Mortgages in the office of the auditor of King county, Wash. At the date of its execution the bridge company owed the bank $28,517.35. On February 23, 1905, for a consideration of $14,000, Watt transferred his mortgage to the appellant herein. The mortgage to the bank was transferred to the appellee, and thereafter the latter filed its answer to the intervening libel of the appellant in the court below to enforce its lien upon the dredger, alleging that the amount thereof was $51,510.87. The question in controversy in the court below was one of the relative rank of the two chattel mortgages. The court found that the lien of the appellee was prior, and awarded it the sum of $45,781.51, which was the amount in the registry of the court after the sale of the dredger and the payment of certain liens thereon adjudged to be maritime. The sum so awarded was less than the total sum due on the appellee's mortgage.

Ira Bronson and D. B. Trefethen, for appellant.

Ballinger, Ronald, Battle & Tennant, Ira A. Campbell, and James Kiefer, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). The appellant claims priority for its mortgage, first, because, the appellee's bill of sale not having been duly recorded as a chattel mortgage, the record thereof was not constructive notice to appellant's assignor, Watt; and, second, it was not shown that Watt ever had actual notice thereof. In view of the contract of December 12, 1899, as we construe it, it is not material to this question of the priority of the liens whether the mortgage to the appellee was duly recorded, or was ever recorded. The provisions of that contract, to which Watt was a party, import to him notice of the mortgage to the bank and of its terms and conditions. Watt did not appear as a witness in the case, and his

whereabouts could not be ascertained. There is but little testimony in the record as to actual notice to him of the mortgage to the bank; but it is enough to say that the mortgage was expressly authorized by him by the terms of the contract above referred to. He knew that the other parties to that contract, who were to furnish the money to build the dredger, were to obtain the money for that purpose upon a mortgage. He expressly authorized them to obtain it in that manner. He knew that the dredger was constructed, and that it was used upon the contract for which it was to be constructed, for he had charge of the work. What additional knowledge did he need to possess?

But it is said that Watt expressly authorized the other two parties to the contract to execute the mortgage, and that when it was signed his name was attached by one of them only, and for that reason the power which he gave to mortgage the property was not lawfully exercised, and his interest in the dredger was never subjected to the mortgage. This argument ignores the nature of the contract under which the mortgage was given. That contract was not a simple power of attorney to the other parties thereto to act for Watt. It was the grant of an express power to the bridge company to incumber the property as their own act to effectuate a right vested in them—a power coupled with an interest. They were to borrow the money to build the dredger and to mortgage it. It was a power not subject to revocation. It was not a personal right, to be exercised only by the particular persons who were then parties to the contract; but it was a right which belonged to the copartnership, which owned an interest in the vessel, and there is nothing to show that Watt ever questioned the validity of the mortgage, or objected to the manner in which the power was executed. It would have been good between the parties, and binding upon Watt, if his signature had not been attached at all.

The paid-up capital stock of the bank was but $150,000, and under section 5200 of the Revised Statutes (U. S. Comp. St. 1901, p. 3494) the bank was forbidden to loan to a single borrower an amount greater than one-tenth of the capital stock actually paid in. It is not contended that because, in violation of this statute, the bank loaned to the bridge company an amount greater than $15,000, the debt was not enforceable against the borrower; but it is contended that Watt had the right to assume that the bank would loan the bridge company no more than was permissible under the statute, and that therefore the appellee should be limited in its participation in the fund in the registry of the court to the amount which the bank was authorized to loan. We do not see upon what principle this proposition can be sustained. The law has imposed no penalty upon a national bank for its failure to obey the restriction, unless it be that its charter thereby becomes subject to forfeiture under section 5239. A court may not inflict penalties other than those which are imposed by statute. The bridge company could have made no defense in the present case on the ground that the bank had violated the statute. Gold Mining Co. v. National Bank, 96 U. S. 640, 24 L. Ed. 648. Wherein is the appellant in a better situation? Watt expressly authorized the bridge company to pledge his interest in the dredger to secure money to build the same and to carry

out the dredging contract. There is positive and direct and uncontradicted testimony in the record that Watt knew that the bank was financing the building of the dredger. He must have known that the amount necessary for that purpose would largely exceed $15,000; for it is not disputed that it was understood, at the time of entering into the contract on December 12, 1899, that the cost of building the dredger then contemplated would be $60,000, and that the plans were subsequently changed, and a larger and more expensive dredger was constructed. From the very nature of the circumstances, if there were no other proof, knowledge must be imputed to Watt of the extent of the indebtedness incurred under his contract with the bridge company and of the bank to which it was owing.

The principal question is whether the appellee's mortgage shall be held to cover advances made by the bank after the date of the appellant's mortgage. The mortgage to the bank is in the form of a bill of sale, and is given "in consideration of the money heretofore advanced * * * for the construction of the dredge hereinafter mentioned, and such further advances as may hereafter be made." Neither the amount so advanced, nor the amount thereafter to be advanced, is stated in the instrument. If Watt had not been a party to that bill of sale, and were not chargeable with full notice of the sum which had been advanced by the bank, very different questions might be presented; but he is to be charged with notice that at that date the bank had advanced $50,517.35, and, although the limit of future advances was not fixed, there can be no question that, so far as the rights of Watt as a second incumbrancer are concerned, the mortgage was sufficiently definite to protect the bank on its account with the bridge company, on which, from time to time, credits and debits were made, up to the amount which was due the bank at the time when the mortgage was made. Except in one or two states, where it is prohibited, a mortgage may be made to secure future advances to the mortgagor, which shall become a first lien for the amount actually loaned, although a part or all thereof be not advanced until after a subsequent lien shall have attached; and such is the law in the state of Washington. Home Savings & Loan Ass'n v. Burton, 20 Wash. 688, 56 Pac. 940. But where, by the terms of the first mortgage, as in this case, it is made optional with the mortgagee whether to make or refuse future advances, there is some diversity of decision on the question whether he will be protected beyond the sum which he shall have actually loaned or advanced at the date when a junior lien is placed of record. By the decided weight of authority, however, and we so hold, such future advances, although optional, are within the lien of the mortgage, and prior to that of a second mortgage, if they were made without actual notice of the second incumbrance, and the recording of a second mortgage does not import notice to the first mortgagee. Ackerman v. Hunsicker, 85 N. Y. 43, 39 Am. Rep. 621; Shirras v. Caig, 7 Cranch, 34, 3 L. Ed. 260; Tapia v. Demartini, 77 Cal. 383, 19 Pac. 641, 11 Am. St. Rep. 288; Savings & L. Society v. Burnett, 106 Cal. 514, 39 Pac. 922; Davis v. Carlisle, 142 Fed. 106, 73 C. C. A. 330; Heintze v. Bentley, 34 N. J. Eq. 562; Rowan v. Sharp's Rifle Mfg. Co., 29 Conn. 282; McDaniels v. Colvin, 16 Vt. 300, 42 Am. Dec. 512; Frye v. Bank of Il-

linois, 11 Ill. 367; Ripley v. Harris, 3 Biss. 199, Fed. Cas. No. 11,853; Anderson v. Liston, 69 Minn. 82, 72 N. W. 52; Schmidt et al. v. Zahrndt, 148 Ind. 447, 452, 47 N. E. 335, and cases there cited.

There is no proof in the record, and it is not claimed by the appellant, that the bank ever had actual notice of the mortgage to Watt. The record shows, moreover, that when the appellant purchased his mortgage he had actual knowledge of the first incumbrance. In view of these facts, and the law applicable thereto, we find no error in the decree of the court below.

The decree is affirmed.