## SCHNEIDER v. THOMPSON.

## THOMPSON v. SCHNEIDER.

### Nos. 9265, 9275.

Circuit Court of Appeals, Eighth Circuit.
April 12, 1932.

A. W. Johnson, of Albert Lea, Minn. (A. L. Guesmer, H. S. Carson, and W. E. MacGregor, all of Minneapolis, Minn., on the brief), for Lena Schneider.

Garfield E. Breese, of Mason City, Iowa (Charles E. Cornwell and Breese & Cornwell, all of Mason City, Iowa, on the brief), for Mackey J. Thompson.

Before STONE and KENYON, Circuit Judges, and CANT, District Judge.

KENYON, Circuit Judge.

There are two appeals before us which may properly be the subject of one opinion. In No. 9275, Lena Schneider, appellant, is the widow of Fred Schneider, deceased, and residuary legatee under his will. Appellee is the receiver of the Citizens' National Bank of Albert Lea, Minn. (herein called the bank), which was closed as insolvent by the Comptroller of the Currency on February 14, 1927, and appellee was appointed receiver February 18, 1927. Oscar C. Olson was cashier and a director of this bank, and the active managing officer thereof. He was also administrator of the estate of Oscar Rood, deceased, and maintained a deposit account in the bank in the name of "Oscar C. Olson Adm. Oscar Rood Est." Before the closing of the Rood estate, Olson became administrator of the estate of Fred Schneider, deceased, and carried an account in the bank entitled "Oscar C. Olson Adm. Fred Schneider Est." Olson was also president of the Farmers' First National Bank of Rake, Iowa. His father was president of the Citizens' National Bank of Albert Lea. A national bank examiner had objected to two notes of A. T. Johnsrud, each for $1,500, and a note of H. B. Ross for $2,677 to the bank, and demanded that the bank remove these notes from the assets and replace the same with cash by October 1, 1924. This objectionable paper was later found to be worthless. In order to take care of this situation created by the withdrawal from the bank's assets of these notes, Olson, as administrator of the Rood estate, drew a check thereon for $6,775.94 to the bank, which check was charged to the deposit account of said estate. The funds so abstracted took up the bad paper including the Johnsrud and Ross notes, which thereafter were not shown on the books of the bank. At this time the Rood estate was not indebted to the bank. Olson's father, president of the bank, was one of the sureties on his bond as administrator of the Schneider estate. The other surety was one Knatvold, who was

a director of said bank. Both sureties became insolvent. Olson sold some of the property of the Schneider estate, and deposited the proceeds in the bank to the credit of said estate. He drew three checks on the Schneider estate account, each payable to the order of the bank; one on February 5, 1925, for $1,200, one on February 9, 1925, for $2,300, one April 2, 1925, for $1,200; a total of $4,700. These checks were charged to the Schneider estate deposit account, and on the same dates the checks were deposited to the credit of the Oscar Rood estate and appear as deposits in the account of said estate. At this time the Schneider estate was not indebted to the bank and was not indebted to the Rood estate. These are the facts involved in the appeal of Mrs. Schneider.

In No. 9265, the appeal of the receiver, the facts are these: Two promissory notes are involved; one of $2,200 given May 3, 1924, by one Nelson to the Farmers' First National Bank of Rake, Iowa, of which Olson was president, and one of $2,000 given by one Ericksen and wife to the Citizens' National Bank of Albert Lea, March 10, 1923. These notes represented excess loans made by the bank to these parties. The Ericksen note was sold to one Reindall. When the notes were taken Olson agreed that if they were not paid when due he would see that they were taken up. The notes were not paid when due, and Olson drew a check on September 2, 1925, against his account in the bank, as administrator of the Schneider estate, in the sum of $4,275.56, payable "to the order L. Nelson note for $2,200; J. Ericksen note $2,075.56." It was charged to and paid out of the Schneider estate deposit account. The two notes had been carried temporarily as cash items. The Rake bank was given credit for the amount of the Nelson note, $2,200. Reindall's deposit account was credited with the amount of the Ericksen note plus interest, $2,075.56. Olson later signed some statements after the closing of the bank that he was the owner of these notes, which he excused on account of his "state of mind."

The facts are that the notes were given as part of the arrangement to circumvent the prohibition of the statute as to excess loans. While in the trial court it was sought by Lena Schneider to have her claim allowed as preferred, such claim is here abandoned, and it is asked that it be allowed as a general claim.

The trial court held that as to the moneys abstracted from the Schneider estate to

make good the abstraction from the Rood estate, it was a personal matter with Olson, and the bank was not charged with notice of his conduct, placing his decision upon the ground that the wrongful use of the funds from the Rood estate in taking out the bad paper of the bank was an accomplished fact before the abstractions from the Schneider estate, and that what Mr. Olson did in transferring credits from the Schneider estate to the Rood estate did not increase the assets of the bank or diminish its liabilities; that the bank was not charged with knowledge of the wrongful character of the acts of Olson as administrator of the Schneider estate, and found in favor of the bank on that transaction. As to the transaction concerning the Ericksen-Nelson notes, it held that the matter was not a personal matter with Olson, but that in his arrangements as to these notes he was acting on behalf of the bank, and the court established Mrs. Schneider's claim against the receiver in the amount of $4,275.56, the sum abstracted by Olson from the Schneider estate to take care of these notes. From this holding the receiver appeals, and from the other holding of the court Mrs. Schneider appeals. In both appeals is involved the question of whether the bank should be held to have had notice and knowledge of Olson's acts. A discussion of this question as to the first transaction will be sufficient, as a holding there that the bank was charged with Olson's acts would necessarily indicate that the same doctrine should be applied to the second transaction. In the latter, however, there is an additional question of ultra vires, which will hereinafter be discussed.

It is the receiver's theory that knowledge of Olson's embezzlement was not imputable to the bank, that the bank did not profit thereby, that Olson was acting entirely for himself and his own benefit, and that the Rood estate holds the stolen funds of the Schneider estate in trust for it.

What is the law applicable here?

■ The rule is elementary that the principal is bound by the knowledge of his agent acquired in the course of the principal's business and while acting within the scope of his authority. The Distilled Spirits, 11 Wall. 356, 20 L. Ed. 167; Curtis, Collins & Holbrook Co. v. United States, 262 U. S. 215, 43 S. Ct. 570, 67 L. Ed. 956.

■ The receiver relies on an exception to this rule which is well stated in 7 Ruling Case Law, p. 657, § 659, as follows: "An exception to the general rule that notice to

an agent is notice to his principal arises in case of such conduct of the agent as raises a clear presumption that he would not communicate the fact in controversy, as where the agent acts for himself in his own interest and adversely to that of the principal; and this rule is applied to officers and agents of a corporation. So where a corporate officer or agent is engaged in committing an independent fraud on his own account and the facts to be imputed relate to this fraudulent act, the corporation is not charged with the knowledge of the officer or agent."

This exception to the general rule is well established.

In Thomson-Houston Electric Co. v. Capitol Electric Co. (C. C. A.) 65 F. 341, 343, in discussing the general rule that the principal ordinarily is charged with notice of what the agent knows in a matter intrusted to him, the court says: "Such a presumption cannot be indulged, however, where the facts to be communicated by the agent to the principal would convict the agent of an attempt to deceive and defraud the principal. The truth is that where an agent, though ostensibly acting in the business of the principal, is really committing a fraud, for his own benefit, he is acting outside of the scope of his agency, and it would therefore be most unjust to charge the principal with knowledge of it."

In Bank of Overton v. Thompson, 118 F. 798, 800, this court says, concerning the action of a cashier there involved: " * * * His knowledge of all the facts connected with the rights of the complainant to that money is imputable to that bank, under the well-settled general rule that the knowledge of an agent, or notice to an agent, while acting within the scope of his authority, is notice to his principal, because within that scope he is the alter ego of the principal, and because the law will presume that the agent has performed his duty to disclose to his principal all notice to himself necessary to his principal's protection or guidance. The officer of a corporation, like a cashier of a bank, is such agent. There are, however, well-settled exceptions to this rule, where notice or knowledge on the part of the agent will not be imputed to the principal, and one of these is 'where the agent's relations to the subject-matter, or his previous conduct, render it certain that he will not disclose it.' Mechem, Ag. § 721. 'In such cases the presumption is that the agent will conceal any fact which might be detrimental to his own interests, rather than that he will disclose it.' "

In American Surety Co. v. Pauly, 170 U. S. 133, 156, 157, 18 S. Ct. 552, 561, 42 L. Ed. 977, the court said: "The presumption that the agent informed his principal of that which his duty and the interests of his principal required him to communicate does not arise where the agent acts or makes declarations not in execution of any duty that he owes to the principal, nor within any authority possessed by him, but to subserve simply his own personal ends, or to commit some fraud against the principal. In such cases the principal is not bound by the acts or declarations of the agent unless it be proved that he had at the time actual notice of them, or, having received notice of them, failed to disavow what was assumed to be said and done in his behalf."

In American National Bank of Nashville, Tennessee, v. Miller, Agent of the First National Bank of Macon, Georgia, 229 U. S. 517, 521, 522, 33 S. Ct. 883, 884, 57 L. Ed. 1310, the Supreme Court said:

"This presents another phase of the oft-recurring question as to when and how far notice to an agent is notice to his principal. In view of the many decisions on the subject, it is unnecessary to do more than to apply them to the facts of this case. If Plant, within the scope of his office, had knowledge of a fact which it was his duty to declare, and not to his interest to conceal, then his knowledge is to be treated as that of the bank. For he is then presumed to have done what he ought to have done, and to have actually given the information to his principal.

"But if the fact of his own insolvency and of his personal indebtedness to the Nashville bank were matters which it was to his interest to conceal, the law does not by a fiction charge the Macon bank, of which he was president, with notice of facts which the agent not only did not disclose, but which he was interested in concealing."

Of course when the agent is committing a fraud entirely for his own benefit and not for the principal's benefit, the principal should not have imputed to him knowledge of the agent's acts, for the agent, when committing a fraud solely for his own benefit, is not acting within the scope of his authority.

The real test as to whether the principal is presumed to have the knowledge which his agent has is whether the agent has stepped out of his position as agent and is acting entirely for himself to subserve his own interest, and not the interest of the principal.

On the subject of exceptions to the general rule of imputed knowledge to the principal of what the agent knows, see Curtis, Collins & Holbrook Company v. United States, 262 U. S. 215, 43 S. Ct. 570, 67 L. Ed. 956; John W. Ladd Co. v. New York Cent. R. Co., 249 Mich. 450, 229 N. W. 517; School Dist. of City of Sedalia, Mo., v. De Weese (C. C.) 100 F. 705; Lilly et al. v. Hamilton Bank of New York (C. C. A.) 178 F. 53, 29 L. R. A. (N. S.) 558; Hilliard v. Lyons (C. C. A.) 180 F. 685; Kean et al. v. National City Bank (C. C. A.) 294 F. 214; Dixie Guano Co. v. Wessel et al. (C. C. A.) 296 F. 433.

What is the situation here? Olson was more than the usual cashier. As stated by the receiver in his brief in No. 9275, "He was the active managing officer of the Bank and substantially in charge and control of its affairs." He practically was the bank, as far as officers were concerned. His father was president, but is not shown by this record to have had much to do with the bank's affairs. Olson was the only witness in the case. He seemed to possess all knowledge as to its business. The directors it is apparent paid little attention to its affairs. They were evidently mere figureheads; otherwise they would have known of the abstractions by Olson at three different times from the Schneider estate. To whom under the circumstances disclosed by this record would notice of matters affecting the bank be imparted? Undoubtedly to Olson, and, in the wide scope of his authority, notice to him as to the affairs of the bank of which he was in complete charge and control would be notice to the bank. If Olson was to keep matters secret from the bank, he would have to keep them secret from himself. When disclosed to him they were disclosed to the bank. When the Comptroller of the Currency directed the bank to retire the Johnsrud and Ross notes, it was Olson who attended to the matter. He abstracted the necessary money from the Rood estate, some $6,775.95, and this went into the bank. He received nothing out of it. He was not acting for himself. The transaction was for the benefit of the bank and for no one else, and the bank became indebted to the Rood estate for that amount. If a new administrator had been appointed and had made a demand on the bank for this money, the bank would unquestionably have had to pay it. Is there such a hiatus here between the transaction as to the Rood estate and the one as

to the Schneider estate that they may be considered so separate and distinct that while the bank had notice of Olson's actions as to the Rood estate account it must be held to have had no notice of or connection with the Schneider account abstractions? When it came time to close the Rood estate a few months after the abstraction of the money from that estate by Olson, it was necessary for the bank to protect this situation. Olson deciding for the bank chose not to use its own funds to rehabilitate the Rood account, which would have depleted its resources, but to find some other account in the bank to loot, and thus to secure the money. As he was administrator of the Schneider estate, the matter was easy. The checks drawn by him on the Schneider estate account were payable to the bank. They were credited to the Rood account at the bank. There was less danger of discovery in looting the Schneider account than other accounts, because of Olson's position as administrator. By this shifting of credits the bank was relieved of its immediate obligation to the Rood estate, and was enabled to retain the sum of $4,700 among its free assets, and that without any record entry on the books showing its indebtedness to any one on account thereof. The whole transaction, connected, interdependent, and interrelated, involving the juggling of the books of the bank, the shifting of credits and deposits, was to subserve the interest of the bank and to enable it to continue in business. Olson did testify that he switched the funds from the Schneider estate into the Rood estate in order to protect himself and so as to keep on running the bank, and that is the main evidence relied on to show that the transaction was entirely an individual one. The looting of the assets of the Schneider estate did not benefit him except incidentally by concealing for a time his conduct and postponing his day of reckoning. Had it come to light that even trust funds were not safe in the bank from the plundering of its cashier in full charge of its affairs, it is easy to imagine that the bank's demise would have been swift and sure instead of being stayed for a while. If a depositor of trust funds in a national bank holding itself out as a safe place to deposit funds presents himself at the bank and asks for the funds he has there deposited it would hardly be a satisfying answer to his demand for the president or a director to say to him that he regretted the situation, that they had such confidence in the cashier as to intrust to him the entire management of the affairs of the bank and no attention was paid to it by the other officers or directors, that the cashier had stolen funds of the bank and had manipulated accounts, which of course they could have known if any attention had been paid by them to the affairs of the bank, but that the inquirer should appreciate that the bank had no notice of the cashier's actions and consequently was not responsible for the funds taken out of his account. The lay mind would have difficulty in comprehending that situation and accepting it with becoming grace. It seems to us that under the circumstances presented by this record, to permit the bank to say, as is now said by its receiver, that it is not bound by the action of Olson in abstracting the funds of the Schneider estate would be a grave injustice. The conclusion of the entire matter is that moneys of Mrs. Schneider were used for the benefit of the bank; that the bank, acting through Olson, received these funds to discharge its pressing liability to the Rood estate. The bank should be charged with responsibility for Olson's action. Bischoff v. Yorkville Bank, 218 N. Y. 106, 112 N. E. 759, L. R. A. 1916F, 1059; First Nat. Bank of Silverton, Colo., v. Mercantile Nat. Bank of Pueblo, Colo., et al. (C. C. A.) 273 F. 119; Fidelity & Deposit Co. of Maryland v. Farmers' Bank of Bates County, Mo. (C. C. A.) 44 F.(2d) 11. In Martin, Sheriff, & Others v. Webb & Others, Trustees, 110 U. S. 7, 15, 3 S. Ct. 428, 433, 28 L. Ed. 49, the court, speaking there of an action of a cashier, says: "When, during a series of years or in numerous business transactions, he has been permitted, without objection, and in his official capacity, to pursue a particular course of conduct, it may be presumed, as between the bank and those who in good faith deal with it upon the basis of his authority to represent the corporation, that he has acted in conformity with instructions received from those who have the right to control its operations. Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision of its officers. They have something more to do than, from time to time, to elect the officers of the bank, and to make declarations of dividends. That which they ought, by proper diligence, to have known as to the general course of business in the bank, they may be presumed to have known in any contest between the corporation and those who are justified by the

circumstances in dealing with its officers upon the basis of that course of business." This seems peculiarly applicable to the situation here, although we are not resting our decision on the negligence of the directors.

While we have discussed the transaction involved in appeal No. 9275, we are satisfied that the same reasoning applies to the transaction in appeal No. 9265. In both of these transactions Olson was the sole representative of the bank and was acting for it, and it is charged with knowledge of and responsibility for his actions.

■■ The remaining question is that arising as to ultra vires in regard to the second transaction, to which we now advert.

In the appeal of the receiver, Thompson, it is insisted that, if the agreement between Olson and the Rake bank and Reindall to take up the notes of Nelson and Ericksen was a bank transaction, as the trial court found and with which we agree, the same is void as an attempt to circumvent the provisions of the federal statutes that limit total liability of a national bank for money borrowed to ten per centum of the amount of the capital stock actually paid in and unimpaired and ten per centum of the unimpaired surplus fund. USCA title 12, § 84. A number of cases are cited by appellant, but none of them it seems to us are in point. Three bank cases are referred to, viz.: McCormick v. Market Nat. Bank, 165 U. S. 538, 17 S. Ct. 433, 436, 41 L. Ed. 817; California Bank v. Kennedy, 167 U. S. 362, 17 S. Ct. 831, 42 L. Ed. 198; First National Bank of Xenia v. Stewart, 107 U. S. 676, 2 S. Ct. 778, 779, 27 L. Ed. 592. None of them deal with the question here raised. In McCormick v. Market Nat. Bank, supra, the action was in relation to a bank contract, and the court said: "The lease sued on, therefore, was clearly prohibited by the very terms of the statute from which the association assumed to derive its power to execute the lease." California Bank v. Kennedy, supra, relates to the question of the transfer of stock to the bank. First National Bank of Xenia v. Stewart, supra, is more of an authority against than for the receiver's position. Speaking of section 5201, Revised Statutes (12 USCA § 83), which provides that no association shall make any loan or discount on the security of the shares of its own stock, the court say: "While this section in terms prohibits a banking association from making a loan upon the security of shares of its own stock, it imposes no penalty, either upon the bank or borrower, if a loan upon such security be made. If, therefore, the prohibition can be urged against the validity of the transaction by any one except the government, it can only be done before the contract is executed, while the security is still subsisting in the hands of the bank."

The fact that the loans to Nelson and Ericksen were excessive does not make the transaction void. The statute does not so provide, and, while a violation of the same might be ground for forfeiture of the bank's charter and while the bank officials might be subject to punishment for exceeding the limitation of the statute as to loans, it is almost the unanimous voice of authority that such loans are not void. If Congress had so intended it could easily have put it in the statute. Hanover Nat. Bank of City of New York v. First Nat. Bank of Burlingame, Kan. (C. C. A.) 109 F. 421; The Seattle (C. C. A.) 170 F. 284; Leonard v. State Exchange Bank of Elk City, Okl. (C. C. A.) 236 F. 316; First Nat. Bank of Chisholm v. First Nat. Bank of Delano (D. C.) 28 F.(2d) 290; Union Gold Mining Co. v. Nat. Bank, 96 U. S. 640, 24 L. Ed. 648; Union Nat. Bank v. Matthews, 98 U. S. 621, 25 L. Ed. 188; Shoemaker v. Nat. Mechanics' Bank, Fed. Cas. No. 12,801; Stewart v. National Union Bank of Md., Fed. Cas. No. 13,435; Corcoran v. Batchelder, 147 Mass. 541, 18 N. E. 420; Mills Co. Nat. Bank v. Perry et al., 72 Iowa, 15, 33 N. W. 341, 2 Am. St. Rep. 228; First Nat. Bank of Portage v. State Bank of Northwood et al., 15 N. D. 594, 109 N. W. 61; Portland Nat. Bank v. Scott, 20 Or. 421, 26 P. 276; First Nat. Bank of Hagerman v. Stringfield et al., 40 Idaho, 587, 235 P. 897.

In Thompson v. Saint Nicholas National Bank, 146 U. S. 240, 251, 13 S. Ct. 66, 69, 36 L. Ed. 956, the court said: "Moreover, it has been held repeatedly by this court that where the provisions of the national banking act prohibit certain acts by banks or their officers, without imposing any penalty or forfeiture applicable to particular transactions which have been executed, their validity can be questioned only by the United States, and not by private parties." The transaction here as to loaning to Nelson and Ericksen had been completed before any question concerning it was raised. We are satisfied that the doctrine of ultra vires has no application to this case.

■ Appellant in No. 9275 is entitled to legal interest from the time of the abstractions

to the date of the closing of the bank. American Nat. Bank of Arkansas City, Kan., et al. v. Williams (C. C. A.) 101 F. 943; Oklahoma State Bank v. Galion Iron Works & Mfg. Co. (C. C. A.) 4 F.(2d) 337; People's Nat. Bank et al. v. Payne (C. C. A.) 26 F.(2d) 208; White v. Knox, 111 U. S. 784, 4 S. Ct. 686, 28 L. Ed. 603.

In No. 9275, the appeal of Lena Schneider, the decree is reversed, and in No. 9265, the appeal of Thompson, receiver, it is affirmed. The case is remanded to the trial court, with instructions to allow, in addition to the $4,275.56 allowed Mrs. Schneider as a general claim against the receiver, an additional amount as a general claim of $4,700, with interest from the dates of abstraction to the date of the closing of the bank.

No. 9265 is affirmed; No. 9275 is reversed and remanded.