## BOSWORTH v. CADY et al.
### No. 5056.

Circuit Court of Appeals, Seventh Circuit.
June 21, 1934.

T. H. Spence and Arthur Wickham, both of Milwaukee, Wis., for appellant.

Nelson Trottman, of Chicago, Ill., and Max H. Strehlow, Wm. L. Evans, and Fred D. Merrill, all of Green Bay, Wis., for appellees.

Before ALSCHULER, SPARKS, and FITZHENRY, Circuit Judges.

FITZHENRY, Circuit Judge (after stating the facts as above)..

The gravamen of appellant's contention and the reason most earnestly urged to sustain a reversal in this case is that in this particular instance Tayler, the president of the receiver's bank, was not the agent of the bank, and that knowledge which he possessed either as to the infirmity of the paper involved or the existence of the equitable defenses in the several makers came to him while acting in his own interest, in an adversary attitude to the bank; therefore the bank was an innocent holder of the paper in due course and not bound by any knowledge, act, or omission of Tayler in connection with its preparation, execution, or delivery. It is urged that, where there is an adversary interest between the agent and the principal, the latter is not bound by the acts or declarations of the agent, unless the principal had full knowledge of them and failed to disavow what was said or done in his behalf. The contention is based upon American Surety Co. v. Pauly, 170 U. S. 133, 18 S. Ct. 552, 42 L. Ed. 977, American National Bank v. Miller, 229 U. S. 517, 33 S. Ct. 883, 57 L. Ed. 1310, and a number of other federal cases; and Schwenker v. Teasdale, 206 Wis. 275, 281, 239 N. W. 434; Farmers' State Bank v. Perry, 186 Wis. 93, 202 N.-W. 179.

The record discloses transactions running through many years. Tayler was personally interested in the Oneida enterprise, but he was also interested, as its president, in the protection and collection of the large amount of indebtedness due the McCartney National Bank. As to the execution of the notes, Tayler testified: "They came to the bank fully executed. When it came time to renew them, in the beginning, Mr. Cady took care of the matter of getting renewals, and after he left it was taken care of from the office of the company. * * * I cannot tell when this arrangement for monthly payments by the several guarantors was made. * * * That arrangement happened to be made because it was the wish of the bank to have the loan liquidated and the thing paid up. I think the guarantors were all called into the bank, and in the first place I made a statement of the entire indebtedness and sent it out with a letter to each one and asked them to come into the bank and so we took it up at that time. We demanded that some arrangement be made for payment."

Bernard C. Olejniczak, a witness for the receiver, testified: "Mr. Tayler, during all of this time up to January 1, 1931, since 1920 or thereabouts, was president of the bank. His office was in the bank. He was there nearly every day. He was very active. He was there for substantially all of each day. Mr. Tayler was president of the bank, an executive officer. He was very active in the management."

The record discloses an abundance of evidence to support the finding of the trial judge that in the transaction of this business Tayler represented at times "the said bank, at times the said guarantors, and at times both."

The trial judge also found that it was the understanding at the time the Oneida syndicate obligation was incurred that Burrall, Phillips, and Tayler were to be liable as comakers with the other signers; that Tayler did not sign any of the notes sued on, and that Burrall and Phillips signed on the back; that the other signers of said notes did not authorize the delivery of said notes to the bank without the signatures as comakers of Tayler, Phillips, and Burrall, and that, until demand was made on Cady, Murphy, and Wagner in December of 1931 for payment, they did not know that the notes did not bear the signatures as comakers of Burrall, Phillips, and Tayler, pursuant to said agreement.

The record shows that throughout the period in question the national bank examiners were seriously criticizing the line of credit which Tayler was carrying for himself in the bank. The only reason which can be deduced from the conduct of Tayler and the other officers of the bank in connection with using this paper without its execution by Tayler was that it would avoid possible additional criticism from the bank examiners, should they find Tayler liable for a portion of this amount when he was already borrowing in excess of the amount which the law permitted from his own bank. It may be that the bank felt it was to its interest to conceal the fact that Tayler was liable on these notes also, even though the bank had to lose his proportionate share of the guaranty. In the light of all the facts, it is a fair presumption that in procuring this paper Tayler was acting either entirely as the agent of the bank or as the agent of both the bank and the syndicate.

The United States Circuit Court of Appeals for the Eighth Circuit recently had a similar case before it in Schneider v. Thompson, 58 F.(2d) 94, 97. All of the cases cited upon this point by appellant in his briefs in the present case were discussed by that court in that case. The court then concludes:

"Of course when the agent is committing a fraud entirely for his own benefit and not for the principal's benefit, the principal should not have imputed to him knowledge of the agent's acts, for the agent, when committing a fraud solely for his own benefit, is not acting within the scope of his authority.

"The real test as to whether the principal is presumed to have the knowledge which his agent has is whether the agent has stepped out of his position as agent and is acting entirely for himself to subserve his own interest, and not the interest of the principal."

 If a promissory note is delivered by the maker to the payee, the act being accompanied by a verbal agreement that the instrument shall not take effect until some specified condition shall have been performed, such as the securing of other signatures, the paper, as between the original parties, and those not holders in due course, will have no validity until the condition is satisfied. See Federal Law of Contracts, §§ 11, 12, and 153; Hodge v. Smith, 130 Wis. 326, 110 N. W. 192; Swanke v. Herdeman, 138 Wis. 654, 120 N. W. 414; Harder v. Reinhardt, 162 Wis. 558, 159 N. W. 959. The McCartney National Bank took the notes sued upon in this case with knowledge of the infirmity of the instruments and not as a holder in due course.

 The trial court found that some time prior to December, 1926, the financial affairs of appellee Murphy had been placed in the hands of J. J. Wragovitch of Detroit, as trustee of Murphy. Wragovitch retained one B. L. Parker to ascertain the amount of Murphy's indebtedness in and about Green Bay and report the same to Wragovitch, who would then send remittances to cover the same. Pursuant to such plan, Parker visited the McCartney National Bank and informed Tayler that he wished a statement of all Murphy's obligations to the bank; that he desired to clean up everything Murphy owed, and the money for such settlement was being furnished from Detroit only on condition that it was to be a complete settlement of all of Murphy's obligations. Tayler advised Parker of the amount of the indebtedness of Murphy to the bank. Parker secured the funds from Wragovitch and delivered them to the bank. The trial court found that this amount was received by the bank in full settlement, payment, and discharge of all indebtedness of Murphy to the bank, direct, joint, or contingent, including the notes involved in the present actions, and that it was an accord and satisfaction of said indebtedness between Murphy and the bank. Later, appellee Murphy was informed by Parker that all his obligations to the bank had been settled, and upon this statement he relied.

The trial court properly found that, by reason of the false representations of the bank, through Tayler, made to Parker, who was acting on behalf of Murphy, and by reason of the neglect, delay, and laches of the bank in pressing said notes for collection, the bank and its receiver are estopped from asserting any liability on the notes as against Murphy.

 The record is clear, and the trial court properly found that Wagner was released by the bank from all Oneida obligations in 1923. The only question on Wagner's appeal is whether he reassumed liability because he continued to sign the notes, as they were renewed, after he had been released from liability. In this regard Wagner testified: "Mr. Tayler talked with me about signing again, making the request for the accommodation and convenience of the bank in keeping that class of paper identical, the same signatures appearing, and assured me that I would not be called upon to make any payments on that signature."

The trial court found that there was no consideration for the signature of Wagner to the notes and that his signature was placed thereon solely for the accommodation of the bank. The bank had knowledge of the fact that he was signing at its request, through Tayler, and that no consideration was received by him or moved to any of the other parties. Evidence to this effect was properly admitted; the bank not being a holder in due course. The receiver is not entitled to recover on a note executed for the accommodation of the bank and on an express agreement that the maker would not be called upon to pay it. Lensing v. Rayzor (C. C. A.) 41 F.(2d) 224; Yates Center Nat. Bank v. Schaede (D. C.) 240 F. 240; Peterson v. Tillinghast (C. C. A.) 192 F. 287.

 In 1924 and 1925 Cady was heavily indebted on individual obligations to other banks in the vicinity of Green Bay as well as the McCartney National Bank, and in addition was liable on his guaranty on the "Syndicate Loan." Being unable to meet these obligations and contemplating bankruptcy, he discussed the subject with Tayler, who dissuaded him. As an alternative, Tayler suggested an arrangement with the other guarantors whereby Cady might be relieved

in part on these obligations. Accordingly, a contract was entered into, dated January 26, 1925, signed by all the parties except Markel (whose signature was waived in a supplemental contract), wherein it was agreed that Cady should pay to Tayler the sum of $10,000, that he be credited with $1,500 on account of certain other property turned over by him, and that, in the event the collateral securing his personal loans to the bank should bring enough on sale to leave a surplus after liquidation of the personal debts, any excess be used to reimburse the other parties for the balance which Cady owed on the "Syndicate Loan," which, under the contract, the other parties were to assume. The effect of these contracts was to make the relation between Cady and the other parties that of surety and principal, and, although Cady's obligation to the McCartney National Bank was not released, yet, as between him and the others, the debt became that of the others.

In 1926 and 1927 Cady inquired of Tayler as to the state of the "Syndicate Loan," and said he was anxious to be released from liability thereon to the bank, inasmuch as he had complied with the terms of the contract. The record supports the court's finding that Tayler, as president of the bank, thereupon "represented to said Cady that he, the said Cady, need not be concerned about his liability on said notes; that said notes were all practically paid up with the exception of the share of said Murphy and a small amount due from said Kress; that said Murphy was then making arrangements to take care of the balance of his obligations; and that he, the said Tayler, had no doubt that the small amount on said Kress' share would also be taken care of.

"* * * Said Cady was shortly thereafter advised that said Murphy had settled his indebtedness with said bank. At the times said bank, through said Tayler, made said representations, the said representations were false, a fact which was known to said Tayler, but not known to said Cady, and said false representations were so made by said Tayler with the intent that said Cady should rely thereon and be lulled into security and take no further action toward securing a release of said obligations or toward protecting his rights as against said other guarantors. * * *

"* * * Said Cady justifiably relied upon said assurances given by said bank through its officers, as aforesaid, that the amounts due said bank under said so-called Syndicate loan were being taken care of, as aforesaid, and justifiably relied further upon the failure of said bank at any time to make demand upon him either for payment or for the execution of any additional or renewal notes, and further justifiably relied upon the known custom of the authorities having supervision over National banks not to permit unsecured notes long overdue to be carried by National banks; and said Cady, by reason of such justifiable reliance, paid no further attention to the said obligation and was lulled into security and induced to take no action either to obtain a release from said obligations or to protect his rights under said contracts as against said other parties liable thereunder."

It is apparent from the record that Cady has been prejudiced by the representations of the bank. He went to the bank with the purpose of securing a release from his obligation to it. By the false representations of the president of the bank he was led to believe that the obligation was practically extinct and that what remained thereof would soon be extinguished. The failure of the bank to make any further demands in respect thereto justifiably caused him to believe that the liability had been taken care of by the other parties. Had the bank not made these false representations, Cady might have been able to secure a release from the bank or to compel payment by the other parties who were at that time solvent and able to meet their obligations, but who are not now able to do so. Because of the misrepresentations of material facts which the bank made, through Tayler, its president, it is now estopped from asserting any liability against Cady upon these notes, and the court was fully warranted by the evidence in so finding and holding.

It cannot be seriously contended that there was no substantial evidence to sustain the findings of the trial court.

The decree is affirmed.