## CONQUEROR TRUST CO. v. FIDELITY & DEPOSIT CO. OF MARYLAND.
### No. 9601.

Circuit Court of Appeals, Eighth Circuit.
Feb. 25, 1933.

Rehearing Denied March 25, 1933.

834

Grover C. James and Vern E. Thompson, both of Joplin, Mo. (Charles M. Grayston, of Joplin, Mo., on the brief), for appellant.

P. E. Reeder, of Kansas City, Mo. (Leland Hazard, George J. Winger, and Winger, Reeder, Barker, Gumbiner & Hazard, all of Kansas City, Mo., on the brief), for appellee.

Before KENYON, GARDNER, and SANBORN, Circuit Judges.

KENYON, Circuit Judge.

Appellant (herein called defendant) is a banking and trust company, organized under the laws of Missouri, doing business at Joplin, Mo. Appellee (herein called plaintiff) is a surety company, organized under the laws of Maryland. As surety on the fiduciary bond of one C. A. Stone, agent for the Joplin district of the Farm & Home Savings & Loan Association (herein called the association) a Missouri corporation, with principal place of business at Nevada, Mo., plaintiff has reimbursed the association in the sum of $61,-500 for defalcations on the part of its agent, Stone; and as subrogee of the rights of the association it now seeks to enforce against defendant an alleged liability for having received funds belonging to the association in payment of a personal indebtedness of Stone. The District Court found the facts to be substantially as alleged by plaintiff, and gave judgment in the amount prayed for.

On November 12, 1921, the association had appointed C. A. Stone its agent for Joplin territory. Stone's duties were to solicit subscriptions for the association's stock, which was of three classes, designated respectively as "monthly installment," "prepaid," and "full paid"; to procure applications for farm or home loans to be made by the association; to collect payments on stock and repayments of principal and interest on loans, and remit the same to the association; and to pay out to borrowers moneys remitted by the association to him as disbursements on loans.

On stock sold and loans procured Stone was entitled to a commission. On the "monthly installment" and "prepaid" stock he was entitled to deduct his commissions before making remittance to the association, whereas his commissions on "full paid" stock and for procuring loans were remitted periodically to him by the association. All expenses of the agency, such as office rent, subcommissions, clerical help, etc., were paid by Stone out of his own funds, derived either from commissions or from outside sources, as by borrowing.

To handle the funds constantly passing through his hands, Stone maintained an account with defendant in the name of "C. A. Stone, Agent." There was some testimony to the effect that the account originally stood in the name of "C. A. Stone, local agent of the Farm & Home Savings & Loan Association, Nevada, Missouri." Until February, 1924, this was the only account carried with defendant. Shortly before that time, at the solicitation of Stone, the association had determined upon making defendant one of the depositories of its surplus funds. The association's understanding with respect to this proposed "depository account," and also its understanding with respect to the "agency account," already established, appear from its letter to defendant of January 28, 1924, the terms of which were accepted by defendant and which we here set forth, as follows:

"Farm and Home Savings & Loan Association of Missouri.

"Nevada, Mo. January 28, 1924.

"Conqueror Trust Co., Joplin, Missouri.

"Gentlemen:

Depository Account.

"Supplementing my letter to you of to-day, I beg to advise that this account must be handled as follows:

"Agent C. A. Stone may deposit in the account and must take a duplicate deposit ticket and send it to this office with the regular report as to what same covers.

"Although Mr. Stone may deposit in this account, he cannot check on same. Those

only who are authorized to sign checks are named on the card. * * *

"From this you will understand why two accounts are to be carried. The other account is the Agent's account, in which Mr. Stone may deposit as well as check on the account.

"But it must be understood and agreed that the Association, through any of its officers, under written request, may at any time be advised as to the condition of Mr. Stone's agency account, and in case of an emergency may check thereon.

"You may 'read between the lines' that the only emergency that would exist, causing us to check thereon, would be through surmise of dishonesty or otherwise; and in view of our knowledge of Mr. Stone we do not think such contingency will arise.

"However, there is one contingency that is always possible—and that is death. In that event, we would want to take over the account and render unto the heirs of Mr. Stone that part which belongs to them, we retaining the part that belongs to this Association, as developed by a check of his account. * * *

"Very truly yours,

"[Signed] E. E. Levens,

"Sec'y. & Gen'l Mgr."

"LV

"Enc."

Further correspondence between the association and defendant at that time related to the terms of bonds to be provided by defendant covering the respective accounts. The bond covering the agency account was required by the association to run both to itself and to Stone as obligees, and recited that the account consisted of funds "actually belonging to the Farm & Home Savings & Loan Association of Missouri." Said bond was renewed from year to year. A renewal bond substituted in 1927 was drawn to run to Stone as agent of the association, instead of to Stone and the association, and omitted the recitation concerning ownership of the funds secured. Plaintiff offered testimony showing that such alteration in terms was without the association's knowledge or consent. In all events the fact of the alteration was clearly insufficient to show a change in the nature of the account, and the District Court was entirely justified in disregarding as immaterial the altered terms of the new bond and in concluding, on the basis of all the evidence, including the letter set forth above, that defendant had "knowledge of the Association's interest in the account, and knew that the moneys deposited in said account were the property of the Association"; that Stone "had authority to withdraw funds from that account to pay his commission and to remit balances periodically to the Association; that he did make such remittances several times each month in large amounts by check upon the agency account payable to the Association, and that the defendant knew that such was the practice"; and that "Stone had no authority to withdraw or use the funds in the agency account at will, and that no representations, either express or implied from a course of conduct, were made by plaintiff to defendant that Stone had such authority, or any authority greater than that which the Association initially represented to the defendant."

Stone had originally purchased the agency from his predecessors, Ridgeway & Kirkpatrick, for $32,000. Of this amount he had borrowed $25,000 from defendant, on the security of certain insurance policies, the indorsements of third parties, and an assignment to defendant of a one-half interest in the agency. The association acknowledged notice of the assignment of an interest in the agency, and knew also that its purpose was to secure moneys loaned to Stone. The amount of this initial loan was entirely repaid, but at frequent intervals throughout the existence of his agency Stone borrowed further sums, similarly secured, from defendant, all of which he deposited in the agency account and repaid from that account. The last of these loans, repayment of which form the agency account is the basis of the liability here asserted, was for $38,000, made August 3, 1927. After repayment of this final loan defendant surrendered to Stone the assignment of a one-half interest in the agency.

Stone did not purport to make these loans on behalf of the association, or to bind it thereto. No doubt some of the moneys so borrowed were used in conducting the Joplin agency, but as already stated the expenses of conducting the agency were the personal overhead of Stone and were in no way chargeable to the association. As found by the District Court, "there was nothing within the scope of Stone's authority or duties which made it necessary or expedient for him, as agent, to borrow money to carry on the business of the Association," and the moneys borrowed by him were used in large measure for his own private purpose of rendering to borrowers a "super-service," in the form of advancing disbursements on loans not yet approved by the association. The "agency" was a separate business entity from the association it represented, and obviously the making of the loans in the name of the "Joplin District Agency, C. A. Stone, Dist. Mgr., C. A.

Stone," or several variations of that form, in no way bound the association. The District Court was entirely right in concluding that the various loans by defendant to Stone were both purportedly and in effect "for his personal use." Obviously the association cannot be bound on any theory either of ratification or estoppel by its knowledge and approval of that which did not require its consent, viz., the making of personal loans to Stone or his agency. The significance of the fact that some of the moneys borrowed may have reached the association in the form of remittances to it by Stone will subsequently be considered.

As found by the District Court, Stone drew upon the agency account, in which funds of the association and his own—the latter in the form of his commissions, the proceeds of the loans, and funds derived from other outside sources—were thus intermingled, "not only for his commissions and to make remittances to the Association, but also for various personal uses, i. e., that he withdrew wrongfully large sums from the agency account but, as will appear from my subsequent findings, he concealed these defalcations, and the Association had no knowledge of them until about November 1, 1927." Further findings by the court below we here set forth, as follows:

"I find the fact to be that a bank account was maintained at the defendant bank pursuant to instructions from the Association to its agent, C. A. Stone, and instructions given directly by the Association to the defendant bank; that this account was carried in the name of the Association and C. A. Stone, agent; that the defendant bank opened the account with knowledge of the Association's interest in the account, and knew that the moneys deposited in said account were the property of the Association. I reach this conclusion not only from the designation of the account upon the books of the defendant and from other evidence, but also, especially, from the letters in evidence between the Association and the defendant, in which the Association authorized Stone to check upon the account, but reserved the right to itself also to check thereon, and specified the form of depository bond, to be given by the defendant, in favor of Stone, as agent, and the Association. I find that this bond was given, containing the recitation over the signature of the defendant that the account consisted of funds 'actually belonging to the Farm & Home Savings & Loan Association of Missouri.' * * *

"I find that Stone had no authority to borrow money for the Association, and that he did not purport to do so. * * * and that all loans made to him by the defendant were for his personal use. I find that Stone commingled proceeds of the personal loans made to him by the defendant bank with the trust funds belonging to the Association, that is, that he deposited in the agency account the proceeds of loans made to him by the defendant bank; but I find, further, as will more specifically appear from subsequent findings, that the Association did not receive any of the proceeds of such loans and did not benefit therefrom, and did not know of the commingling. * * *

"I find that on August 3, 1927, the defendant bank held the note of C. A. Stone in the principal amount of $38,000.00, payable by the terms of said note on August 20, 1927, and secured as in the case of the initial loan by assignment of one-half interest in Stone's agency; that on August 20, 1927, Stone drew a check upon the agency account using the agency form bearing the insignia Farm & Home and signed Joplin District Agency, C. A. Stone, Agent, in the amount of $14,000.00, payable to the defendant bank; that this check was applied upon the indebtedness of Stone to the defendant bank; that on September 21, 1927, Stone drew a check upon the agency account using a form of check bearing the designation 'Counter-Check' signed C. A. Stone, Agent, in the amount of $24,176.88, payable to 'Cash'; that this check was applied upon the indebtedness of Stone to the defendant bank; and that the proceeds of said checks both drawn upon the agency account, were appropriated by the defendant bank to the payment of the principal and interest upon the $38,000.00 note. * * *

"I find from the undisputed testimony of the witness Hammond, an accountant, that of all funds deposited in the account between August 3, 1927, and August 22, 1927, the date on which Stone's $14,000.00 payment to the defendant bank was charged against the account, Stone was entitled for his personal withdrawals to the sum of $739.79, and that within the same period he had withdrawn for personal uses $2,633.80, so that prior to his withdrawal of the $14,000.00 to pay his personal indebtedness, he had misappropriated from the agency account within that period the sum of $1,894.01 in addition to other accumulated defalcations which I shall later mention. From this I conclude that although there were sufficient funds in the agency account on August 22, 1927, to cover Stone's

payment of $14,000.00 to the defendant bank, yet there were no funds in the account on that date belonging to Stone; therefore, the payment was made wholly from trust funds, and the defendant bank accepted that payment with knowledge of the trust character of those funds. * * *

"I find that on September 3, 1927, Stone acquired from outside sources personal funds in the amount of $16,500.00 which he deposited in the agency account, but his accumulated defalcations had further increased in the interim, and this deposit merely served to reduce the amount of such defalcations, to the sum of $13,557.83. Continuing this analysis of the agency account to September 21, 1927, the date on which Stone paid the balance of his personal indebtedness to the defendant bank in the sum of $24,176.88, I find that the accumulated defalcations were never cured and that just prior to that payment they amounted to $15,710.47. With this condition obtaining, and without having cured the existing default, Stone drew upon the agency account for $24,176.88 to pay his personal indebtedness to the defendant bank. Although there were sufficient funds in the agency account to pay that withdrawal, yet there were no funds in that account belonging to Stone. From this I conclude that this payment was made wholly out of the trust funds of the agency account, and that the defendant bank accepted that payment with knowledge of the trust character of those funds.

"I find that the ultimate accumulated defalcations were discovered as of November 3, 1927, and amounted to $66,706.66; that is, that Stone had failed to account for that amount of money received by him for the Association; that included in this defalcation is the sum of $38,176.88 paid by Stone to the defendant bank to satisfy his personal indebtedness to the defendant bank. * * * *"

Other findings were made by the trial court covering all the questions involved in the case. These findings of fact made in an equity proceeding are presumptively correct and will not be disturbed unless a serious mistake of fact appears. Coats v. Barton (C. C. A. 8) 25 F.(2d) 813; Karn v. Andresen (C. C. A. 8) 60 F.(2d) 427; United Shoe Machinery Corporation v. United States, 258 U. S. 451, 42 S. Ct. 363, 66 L. Ed. 708.

The court held that plaintiff had been properly subrogated to the rights of the association, as it had paid to it the amount of Stone's defalcations, which included the $38,176.88 paid by Stone to the defendant, and that plaintiff was not estopped to assert the liability of defendant through it having re-tained the assignment of a one-half interest in the agency, which upon being surrendered by defendant to Stone, and after discovery of the default, had come into the possession of the association and had been delivered by it along with Stone's other effects to plaintiff. On the basis of its findings the court concluded as a matter of law that plaintiff was entitled to recover of defendant the sum of $38,176.88, with interest.

A number of assignments of error are argued, the most important of which is that relating to the alleged error of the court in overruling the motion of defendant to dismiss the case at the conclusion of plaintiff's testimony. The questions therein raised are controlling, and are the basis of most of the discussion on this appeal. They are summarized in appellant's brief as follows:

"D–1. The testimony taken in its most favorable light to the plaintiff does not support any action for the recovery of any judgment from the defendant.

"D–2. If this Court should be of the opinion that the evidence in this case shows that the plaintiff would have a cause of action against the defendant, then we contend that the evidence as offered by the plaintiff and as shown by Exhibits 23 and 24 (Tr. pp. 52 and 53) shows that there was a contractual relation existing between the Loan Association and the Bank and Stone relative to this account, and that an action thereon between the proper parties would be a law action and not an equity action and that therefore this case should have been dismissed by the trial judge at the conclusion of plaintiff's testimony.

"D–3. That the case should be dismissed because the plaintiff failed to show any right of subrogation.

"D–4. For the reason that the plaintiff could not maintain the action as an assignee of any rights which might be possessed by the Loan Association."

Defendant's theory is that the agency account of the association in the bank was a mingled account, that the bank had no knowledge that Stone had embezzled any money, or that the checks in question were drawn for any wrongful purposes; that there were no circumstances to put the bank on inquiry before it accepted Stone's checks on the agency account for the payment of the notes in question; and that in any event this case presents an exception to the general rule of liability of a bank where a trustee draws trust funds known to the bank to be such to pay an individual obligation of the trustee to the bank, in that here the indebtedness was in-

curred for the principal and the proceeds of the loans were deposited to the credit of its account, and that there is no liability on the bank unless it has actual notice of the misapplication. Maryland Casualty Co. v. City Nat. Bank (C. C. A. 6) 29 F.(2d) 662, is possibly an authority for this position. The court there distinguishes the rule announced in Bischoff, Adm'r v. Yorkville Bank, 218 N. Y. 106, 112 N. E. 759, L. R. A. 1916F, 1059, and indicates it thinks that the conclusion in that case is not sound, while this court in Fidelity & Deposit Co. of Maryland v. Farmers' Bank (C. C. A. 8) 44 F. (2d) 11, quotes from that case with approval, so this court is evidently not in harmony with the rule announced in Maryland Casualty Co. v. City Nat. Bank, supra.

The situation as found by the trial court is that defendant received, by virtue of the check for $14,000 and the one for $24,176.-88 in payment of Stone's personal debt to it, trust funds, knowing them to be such. It would seem there could not be much controversy over the general propositions of law here applicable. In United States Fidelity & Guaranty Co. v. Union Bank & Trust Co. (C. C. A. 6) 228 F. 448, at page 451, this language, strikingly in point, is used:

"The official funds on deposit were not, as between the clerk and the bank, a trust fund; but as between the clerk and the beneficiaries, the fund was largely or wholly made up of trust moneys; and this case must be approached by way of the proposition that if the bank, out of this fund, either satisfied its debt against the clerk personally, or affirmatively and intentionally aided him in wrongfully appropriating it to his own use, a liability therefor accrued in equity against the bank in favor of the beneficiaries. We think this proposition follows from the decision in [Central National] Bank v. Insurance Co., 104 U. S. 54, 26 L. Ed. 693. True, in that case, Mr. Justice Matthews called attention to the fact that the court was not dealing with a voluntary application of the fund by the check of the depositor, but with an attempt to enforce a banker's lien; but we do not see a controlling distinction between the two situations, as the former has developed in this case. Once admitting that the fund belongs in equity to the beneficiary and that the bank knows this, it seems clear that the bank can get no better right against the real owner from the fact that the depositor, trustee, colludes with the bank in the wrongful application.

"From such a liability, on account of a bank debt paid, the bank could find no protection in the fact that it acted on the mistaken supposition that mingled in the deposit was enough money belonging to the depositor to satisfy his check. When such a joint fund is drawn upon for a payment to the bank to discharge a mere personal debt to it, the bank takes the money at its peril of having to refund, if in fact the trust deposit is thereby depleted. This is the teaching, though not the holding, of the case in 104 U. S. The refund works no injury to the bank; it has no equity equal to that of the real owner."

In Union Stock-Yards Nat. Bank v. Gillespie, 137 U. S. 411, 419, 420, 11 S. Ct. 118, 121, 34 L. Ed. 724, the court says: "The question here is not as to the character of the obligation of factor to principal, but as to the liability of one who takes from a factor, in payment of his debt, moneys which he knows equitably belong to that factor's consignor and principal. Justice forbids the upholding of such a transaction, and demands that the bank, receiving from the factor in payment of a debt from the factor to itself, moneys which it must have known were the proceeds of the property received from his consignor and principal, account to that principal for the moneys so received and appropriated."

The rule is clearly stated in Alexander v. Security Bank & Trust Co. (D. C. Tex.) 273 F. 258, 262: "It is hardly necessary to state that the courts recognize that in the interest of commercial security a bank may safely deal with a depositor without undertaking to scrutinize the source of his deposits, or, even if the trust character is known, seeing to the proper application of the funds. It is well settled that a bank has the right to assume that the depositor is acting within his authority, and will deal justly by his principal; but this rule breaks down, or rather, has no application, where a bank, with knowledge of the trust character of a deposit, assists the depositor to misapply it by appropriating it, either by a charge ticket, or through the check of the depositor, to the private obligation owed by the depositor to the bank."

In Havana Cent. R. Co. v. Central Trust Co. of New York (C. C. A. 2) 204 F. 546, 551, L. R. A. 1915B, 715, the court said: "But if the bank have knowledge that the officer is using the check for his personal benefit, e. g. to pay his debt to the bank or to deposit it to his personal credit, then the bank is put upon inquiry and if it fail to make it, pays at its peril." United States Fidelity & Guaranty Co. v. Citizens' State Bank

of Langdon, 36 N. D. 16, 161 N. W. 562, L. R. A. 1918F, 326; Security Bank & Trust Co. v. Geren (C. C. A. 5) 288 F. 317; Oklahoma State Bank v. Gallon Iron Works & Mfg. Co. (C. C. A. 8) 4 F.(2d) 337; Alexander v. Security Bank & Trust Co., supra; Central National Bank v. Insurance Co., 104 U. S. 54, 26 L. Ed. 693.

The cases cited by appellant as to the obligations of a bank in dealing with trust funds do not, in our judgment, cover the situation presented here. They are all distinguishable. In some of them the bank did not know the trust character of the fund. Commercial Nat. Bank v. Stockyards Loan Co. (C. C. A. 8) 16 F.(2d) 911. In some the record did not show that the funds were used to pay an indebtedness of the bank. Empire Trust Co. v. Cahan, 274 U. S. 473, 47 S. Ct. 661, 71 L. Ed. 1158, 57 A. L. R. 921. None of them deny the proposition that a bank is responsible where a trustee pays his personal debt to the bank out of the trust funds in the bank known by the bank to be such. The governing principle wherever the bank itself receives the funds diverted from the trust account, as distinguished from where the bank is charged with having participated in a wrongful diversion to outside parties, is not so much the tortious nature of what the bank has done, Maryland Casualty Co. v. City Nat. Bank, supra, but is rather that as between the bank and the cestui que trust the cestui has the prior and stronger equity.

In Whiting v. Hudson Trust Co., 234 N. Y. 394, 138 N. E. 33, 36, 25 A. L. R. 1470, it was held that under the circumstances there the depository trust company was not liable, in that, though it had knowledge of the trust character of the deposit, it had nevertheless paid out the funds therefrom pursuant to a duly authorized check of the trustee, and with no knowledge of the intended misapplication. But this significant language is found therein, "A different question would be here if the trust company had received the check for its own use, as, for example, in payment of a debt"—citing Bischoff v. Yorkville Bank, 218 N. Y. 106, 112 N. E. 759, L. R. A. 1916F, 1059. There is a great difference between a situation where a bank pays out of trust funds on the check of the trustee some one else's debt, and where the bank accepts payment out of the trust funds for its own debt.

■ It is clearly the law that wherever a depository bank receives funds which it knows or has reason to know are subject either in whole or in part to a trust, in payment of a personal obligation of the trustee to it, it becomes liable in equity to the defrauded cestui. If to its knowledge the funds are subject in their entirety to a trust, the bank is a guilty party to the misapplication; if to its knowledge they are subject in part to a trust, it acts at its peril.

■ Here according to the findings of the trial court defendant had full knowledge of the partial trust character of the account from which it received payment of the personal indebtedness of Stone to it, and that Stone's authority to check therefrom was limited; that he could withdraw trust funds only for the association purposes. Defendant was entitled to honor Stone's checks drawn to outside parties without investigation either into their purpose or into the state of the account as between Stone and the association, unless it affirmatively knew that a breach of trust was being committed, but when it received from the commingled account payment of Stone's personal indebtedness it had warning that it might thereby itself be receiving the fruits of a breach of trust, and so it gained no equity superior to that of the association. It had upon it under these circumstances the duty to investigate the account as between Stone and the association. It acted at its peril in not so doing. Therefore defendant is liable for such trust funds as can be traced to its possession. In somewhat analogous situations the court dealt with the liability of banks in Citizens' & Southern Bank v. Fayram (C. C. A. 5) 21 F.(2d) 998; Swift & Co. v. Hammond Farmers' Ass'n, Ltd. (D. C. La.) 22 F.(2d) 166; Farmers' Bank of Alamo, Ga., v. United States Fidelity & Guaranty Co. (C. C. A. 5) 28 F.(2d) 676.

■ In reaching the conclusion that the $38,176.88 received by defendant from the mingled account represented trust funds rather than personal funds of Stone, the court applied the rule, applicable wherever intermingled trust and personal funds are drawn upon for the personal uses of the trustee, that such withdrawals are to be ascribed to the personal funds until the proportion represented by them is exhausted. Board of Com'rs of Crawford County v. Strawn (C. C. A. 6) 157 F. 49, 15 L. R. A. (N. S.) 1100; Empire State Surety Co. v. Carroll County (C. C. A. 8) 194 F. 593; Commercial Nat. Bank of Independence, Kan., v. Stockyards Loan Co., supra; People's Nat. Bank v. Moore (C. C. A. 8) 25 F.(2d) 599.

■ The point is made that as the proceeds of the bank's loans to Stone were deposited in the agency account the association was enriched and the bank would acquire a prior

lien upon that account to reimburse itself for the amount of such loans. This argument would find basis only if the proceeds of the $38,000 loan were remitted by Stone to the association. The record does not so show, and there is no finding to that effect. The bank did not undertake to lend money to the association in any way. The loans were to Stone personally. If this money had been used to pay obligations of the association to third parties, the situation would have been quite different, for the association then would have been enriched to some extent. The loan from the bank to Stone was merely a voluntary loan, and Stone had no authority to borrow money for the association.

The District Court found that at the close of business on August 3, there was an overdraft in the agency account; the court starts from that point to figure, and demonstrates that whatever personal funds were deposited between that time and August 22, when the $14,000 payment was made to the defendant bank, including the amount of commissions to which Stone might be entitled, were absorbed. On August 22, there was nothing left in the account other than trust funds out of which the $14,000 payment could have been made. The liability of defendant is clear as to this $14,000.

As to the payment to the bank of $24,176.88, the trial court assumed that all further deposits of personal funds between August 22, 1927, and September 21, 1927, automatically operated to reduce the accumulated defalcations in Stone's remittances of trust funds to the association, and that, since the amount of accumulated defalcations was continuously in excess of the personal deposits, the account on September 21, when the payment was made, was still composed solely of trust funds. We are not satisfied this reasoning is legally correct, as the law is as stated in Maryland Casualty Co. v. City Nat. Bank (C. C. A. 6) 29 F.(2d) 662, 664: "And when a trust fund has once been dissipated or reduced, subsequent deposits of personal funds, made in the due course of business, without any specific intention to restore the trust fund, are not to be applied to such restoration, but the dissipation of that fund continues as before."

In Board of Com'rs of Crawford County, Ohio, v. Strawn, supra, at page 51 of 157 F., it is said: "It is, * * * a part of the rule applicable to following misappropriated moneys into a bank account that, if at any time during currency of the mingled account the drawings out had left a balance less than the trust money, the trust money must be regarded as dissipated except as to this balance, the sums subsequently added to the account from other sources not being attributed to the trust fund." See, also, In re Ruskay (C. C. A. 2) 5 F.(2d) 143; Schuyler v. Littlefield, 232 U. S. 707, 34 S. Ct. 466, 58 L. Ed. 806.

The question here is, What was the trust character of the fund on September 21, 1927, when the $24,176.88 was paid by Stone to the bank? How is this to be arrived at? The method is set forth in Maryland Casualty Co. v. City Nat. Bank, at page 664 of 29 F.(2d) as follows: "Hence, when trust money has been deposited in a joint account, and it must be determined how much of it remains on a given date, the minimum balance existing between that date and the date of deposit is the amount remaining and identifiable as a trust fund." The same substantially is the rule of this court; see Macy v. Roedenbeck (C. C. A. 8) 227 F. 346, L. R. A. 1916C, 12; State Bank of Winfield v. Alva Security Bank (C. C. A. 8) 232 F. 847. This "minimum balance" theory is of course merely a mathematic means of resolving a conflict of interest in the absence of evidence that the trustee intended by the subsequent deposits to restore the depleted trust funds. There is no evidence of such intent on the part of Stone.

We do not think the deposit by Stone on September 3 of $16,500 of personal funds operated automatically to reduce the amount of accumulated defalcations in his remittances of trust funds to the association, nor was the amount of accumulated defalcations still existing just prior to September 21 material in determining the trust character of the account on that day.

Throughout the entire interval between August 22 and September 21 Stone continued to make remittances to the association. The trust character, however, of all funds acquired by Stone on behalf of the association required that he remit them in connection with the transactions out of which they arose; and the amount of all prior defalcations to the association represented the personal obligations of Stone, to which he was not entitled to apply trust funds arising out of subsequent transactions. Accordingly, in determining the amount of Stone's personal withdrawals between August 22 and September 21, there should be included the amount of all remittances actually made by Stone to the association in reduction of accumulated defalcations. Remittances made in connection with the transactions out of which the funds remitted actually arose should of course not be so included. If Stone's personal with-

drawals between August 22 and September 21, so reckoned, continuously absorbed whatever personal deposits were made by him during the same period, in accordance with the rule already discussed, it follows that the payment to defendant on September 21 of $24,176.88, like the payment on August 22 of $14,000, had necessarily to be made out of trust funds. If they did not, then the payment on September 21 was made out of trust funds in the amount that $24,176.88 exceeded the amount of personal funds left in the account on that date, determined in accordance with the principles stated.

The question of fact here is whether between September 3 and September 21 Stone actually withdrew, in the form of remittances to the association on past defalcations or otherwise, personal funds of an amount sufficient to absorb the $16,500 deposit of September 3.

There is no specific finding of fact on this question. The expert accountant Hammond, who testified at length covering the entire situation, made certain schedules which were introduced in evidence reflecting his analysis of receipts and checks upon the mingled fund. In one of these, Exhibit 61, he sets forth the remittances under date of September 6, 1927, of Stone to the association on account of his August collections, and also some payments out of some proceeds of a real estate loan, the funds of which had been received from the association on September 1, as follows:

| | |
|---|---|
| Check #5037 Coll. Sheet #5 for Aug. | $ 2,344.05 |
| Check #5022 "  "  #4 "  " | 11,291.67 |
| Check #5026 R/E-Bumgarner (proceeds received from F & H Sept. 1st (see page 9) | 2,500.00 |
| | $16,135.72 |

—and then the summary recites:

"He had only $479.84 total funds on hand (bank and office) on Sept. 2nd and was then short $30,000. This, in itself would compel him to scrape up money from some source to meet the above checks, and that is why he borrowed the $16,500. It cannot be supposed that, in the face of these facts, he would use any part of his trust funds received subsequent to Sept. 2nd to liquidate obligations accrued prior to that date—not even the $479.84 balance in hand Sept. 2nd. The only reasonable presumption is that he used the borrowed money to clear up his old indebtedness (deficit), as far as possible, before [encroaching] on his September receipts. Even after doing this, he was still short over $13,000. Unquestionably, therefore, at least $16,135.72 was used out of the borrowed funds to meet the three checks listed on the preceding page, leaving not more than $364.28 remaining of the $16,500 deposit. This remainder was eaten up by subsequent disbursements (net) for his personal account before the final payment on the note was made to the Conqueror—to-wit, the $3,354.17 mentioned in paragraph (d).

"This leads to the inevitable conclusion that the second payment of $24,176.88 to the Conqueror came out of trust funds, as did also the first payment of $14,000.00, making a total payment to the bank of $38,176.88 out of trust funds belonging to the Farm & Home."

The trial court found that this payment of $24,176.88 on September 21, 1927, was made wholly out of trust funds, but made his finding on the theory of accumulated defalcations. While we do not agree with this theory, nevertheless if there is substantial evidence to support the finding of the court it is not important that we might differ with the processes of reasoning employed to reach it, and we believe the evidence of Hammond is sufficient, coupled with the presumption that the payments by Stone on past defalcations were made out of personal funds as long as they lasted, to support the court's finding that the $24,176.88 was paid out of trust funds, which implies that the $16,500 of personal funds was completely absorbed by September 21, 1927.

It is insisted that the action should have been one at law, and not one in equity; that the evidence shows there was a contractual relationship between the loan association, the bank, and Stone relative to the account. The letter of January 28, 1924 (set out heretofore), and that of January 29, 1924, to the Conqueror Company acknowledging receipt of the letter of January 28, 1924, are relied on as establishing a contractual relationship. We do not see how these letters in any way create a contractual situation. The letter of January 28, 1924, from the association to the Conqueror Trust Company merely specifies how these accounts are to be carried. The purpose of the letter seems to be to notify the bank that the funds in the agency account belong to the association, except such as Stone could retain as commissions on collections. This is an action based on subrogation, which is a well-recognized ground of equity jurisdiction. Further, the charge here is, wrongfully receiving trust funds in such way as to be a participant in the breach of trust, and the attempt is to trace and secure these funds, which can be done only in equity.

Plaintiff's retaining the assignment by Stone to defendant of a one-half interest in the agency, which on payment of the $38,-000 note had been surrendered by defendant to Stone and still later surrendered by Stone to the association and by the association to plaintiff, is immaterial, since upon termination of the agency, which was terminable at will, the assignment ceased to have value. It had never been of value as against the association. See Willcox & Gibbs Sewing-Mach. Co. v. Ewing, 141 U. S. 627, 12 S. Ct. 94, 35 L. Ed. 882; Staroske v. Pulitzer Pub. Co., 235 Mo. 67, 138 S. W. 36. In any event plaintiff is proceeding under the theory of subrogation, which comes to it as a matter of law and is not destroyed by the alleged assignment.

The refusal of the court to allow defendant to file a supplemental answer after the opinion below had been filed was under Equity Rule 34 purely a matter of the court's discretion. Regardless of this fact, the agreement, which the supplemental answer alleged had been made between plaintiff and Stone, was a mere covenant on the part of plaintiff not to sue Stone, and in no way a release of its causes of action. The Thomas P. Beal (D. C. Wash.) 298 F. 121; Pacific States Lumber Co. v. Bargar (C. C. A. 9) 10 F.(2d) 335.

The record shows that plaintiff has paid the entire loss to the Farm & Home Association, and that this $38,000 in question is a part of that loss. It would seem clear that the surety company, having settled the entire loss of the association, was entitled to be subrogated to any rights against the defendant which the association could have asserted. We are satisfied the decree of the trial court is correct, and it is affirmed.