**CENTRAL SURETY & INS. CORPORATION
v. MEDOMAK NAT. BANK.**

District Court, D. Maine, S. D.
Oct. 30, 1933.

Carl C. Jones, of Portland, Me., and Lynn Webb and McCune, Caldwell & Downing, all of Kansas City, Mo., for plaintiff.

W. B. Skelton and Skelton & Mahon, all of Lewiston, Me., and Harold Smith, of Waldoboro, Me., for defendant.

PETERS, District Judge.

This suit is brought by the surety on a guardian's bond to recover the amount it was obliged to pay on account of the defalcation of the guardian, who was also an officer of the defendant bank where the guardian's deposit was kept; the liability of the bank being based on alleged notice of, and participation in, the wrongful handling of the account. The plaintiff stands in the position of the ward, so far as this suit is concerned, and the jurisdiction of the court, the propriety of this suit in equity, and the title of the plaintiff appear to be conceded. The matter of the liability of the bank is the only question to be decided.

Findings of Fact.

Hadley H. Kuhn, on November 4, 1930, and thereafter until December 25, 1931, when he committed suicide, was vice president, cashier, and a director of the defendant, a small bank in the town of Waldoboro, Me., and had full charge and management of its

records and business, without interference from the other directors, whose discharge of their duties was more or less perfunctory, except that the president of the bank exercised supervision over investments. On November 4, 1930, Kuhn was appointed, and soon after qualified, as guardian of Mrs. Frances E. Simmons, the plaintiff being surety on the bond required by the probate court. At that time the assets of the guardianship estate consisted of a deposit of $45,421.91, in the savings department, represented by account No. 2810, on the books of the defendant bank. After his appointment as guardian, Kuhn opened a checking account in his name as guardian of Mrs. Simmons, and from time to time transferred amounts from the savings account to the checking account in the same bank. Both accounts were known to the bank to be trust accounts, and Kuhn was known to be the trust officer who had the handling of them.

Soon after his appointment as guardian of Mrs. Simmons, Kuhn began speculating in stocks and opened a margin account with Hornblower & Weeks and with Hayden Stone & Co., reputable brokerage houses having branches in Portland.

To finance his speculations and cover his losses, Kuhn used the money of Mrs. Simmons intrusted to him as guardian, and after his death the guardian who was appointed to succeed him collected from the plaintiff surety company the sum of $42,338.99, which, with interest, is the amount sought to be recovered in this suit.

An analysis of the methods by which the money was wrongfully taken from the Simmons accounts is necessary in order to determine the liability of the bank. Neither of the brokerage houses mentioned would accept checks to be credited to a speculative account if they were drawn or appeared to be given by a trust officer in his official capacity. The rule of the brokers to that effect was probably known to Kuhn, because his checks to them were always personal checks when they were sent out by him. They were all drawn on the defendant bank against his individual checking account, which was at all times trifling and never approaching the amount necessary to honor the checks.

#### Withdrawals from the Estate Checking Account.

Kuhn began his speculative career, so far as this case is concerned, by purchasing a thousand dollar bond issued by the St. Louis & Southwestern Railroad, and leaving it with Hornblower & Weeks as collateral for his margin account. To do this he drew his personal check on the defendant bank for $855.28, and sent it to the brokers to buy the bond. The check reached them December 15, 1930. In the regular course of business that check, with others on the same bank, reached the Federal Reserve Bank in Boston, and was included in its collection letter of December 16, 1930, sent to the defendant bank. It was the custom of the latter bank and the duty of one Miss Hoak, a clerk therein, on receipt of the daily letter from the Federal Reserve Bank, to open it in the morning of its receipt, ascertain from the individual depositors' ledger whether checks were good, draw the bank's check on its Boston correspondent for the total amount of checks accepted, and on the same day mail the bank's check, signed by its cashier or assistant cashier, to the Federal Reserve Bank in payment of the checks that had been accepted and honored. In pursuance of this routine the check for $855.28, drawn by Kuhn, was found by Miss Hoak in the Federal Reserve letter received December 17, 1930. She found that Kuhn's account would be considerably overdrawn by payment of this check, and called Kuhn's attention to that fact. He thereupon added the designation "Gdn" after his name—either that or the words "Guardian of Frances E. Simmons." The check signed in that way would be good, because on that same day Kuhn had withdrawn $855.28 from the savings account of Frances E. Simmons and placed it to the credit of his checking account as her guardian. Miss Hoak was unsuspicious, and in several similar cases unwittingly assisted Kuhn in carrying out his plan by showing him the checks as they came in as individual checks and suggesting that he had forgotten to put the designation "Guardian" on them; whereupon Kuhn would make that addition to his individual name and transfer from the Simmons savings account sufficient money to cover the checks, and they would be cleared in the usual way. Substantially the same course of action was pursued in the case of a check for $856.67, paid by the bank December 19, 1930, a check for $1,014.63, received and paid by the bank December 23, 1930, a check for $966.53, received and paid by the bank December 30, 1930, and a check for $2,500, received and paid by the bank October 5, 1931. The five checks mentioned are the items described respectively as (a), (b), (c), (d), and (q) in paragraph 14 of the plaintiff's bill.

The possible suspicions of Miss Hoak or of any person coming in contact with the transaction were further allayed by the fact that these checks, although purporting to be

Kuhn's individual checks, were on a particular pink-colored paper which he used regularly to draw money legitimately from the estate checking account. The transaction became, in a way, routine. Miss Hoak, on receipt in the collection letter of one of these individual checks on pink paper, would at once take it to Kuhn to put on the apparently forgotten designation of "Guardian."

That this routine occurred in the case of the $2,500 check is not so certain as in the case of the four checks first above mentioned; but I have included it in the same category by reason of the testimony of Miss Hoak that she did not charge any checks to the guardianship checking account that were not signed as guardian.

### Withdrawals from the Estate Savings Account.

On January 23, 1931, Hornblower & Weeks received from Kuhn his personal check on the defendant bank for $4,000. This was credited on Kuhn's account with that firm, and the check was included in the Federal Reserve letter to defendant of January 24, 1931. January 25th was Sunday. On January 26th the fact was called to Kuhn's attention, either by the clerk Miss Hoak or the assistant cashier Miss Bailey, that his personal account would not stand payment of a check of that size. He directed the check to be paid by the bank, however, and it was paid in the usual way on January 26, 1931. The check remained the individual check of Kuhn and not his check as guardian. It was not charged to his individual account, which in that case would have shown a heavy overdraft, but was simply put in the cash drawer and carried there and on the ledger as a "cash item." It was known by Miss Hoak and Miss Bailey to be in the drawer as a cash item. The bank had paid this check out of its own funds. On January 27th the assistant cashier, Miss Bailey, had a conversation with Kuhn about this check which was then the property of the bank. On that day, at the request of Kuhn, the assistant cashier made out a withdrawal slip which Kuhn signed and which Miss Bailey entered on the Simmons savings account, withdrawing $4,000 from that account. This withdrawal slip, instead of being filed by her in the usual place, was given by Miss Bailey to Kuhn. She then, under Kuhn's direction, made an entry on the general ledger, or daily journal so-called, increasing by $4,000 the apparent withdrawals from savings accounts of the preceding day by adding the figure "4" to the actual amount of withdrawals, which was $485. The $4,000 check was then taken by Kuhn from the cash, and was not again seen in the bank.

These proceedings had several objects which were accomplished by Kuhn with the assistance of Miss Bailey: the cash item of $4,000 was eliminated by a transfer of that amount from the Simmons savings account to the general assets of the bank, the worthless check was removed by Kuhn from the cash and apparently destroyed, the fact of the large withdrawal from the Simmons savings account was kept from another clerk handling that department by concealment of the withdrawal slip and otherwise, and the books were made to balance. Miss Bailey, the assistant cashier, knew that Kuhn was interested in stocks, and perceived that Kuhn's check to the brokers was paid by the bank when Kuhn had no funds, and that the consequent damage to the bank was subsequently repaired by abstracting funds from the estate of which Kuhn was guardian, accompanied by false entries on the books and other irregular proceedings. Miss Bailey was neither inexperienced nor unintelligent. She had been assistant cashier of the bank since 1928, and employed for some eleven years by the bank in various clerical and official capacities. She testified that she asked Kuhn no questions except whether the "cash would come right."

The above transaction as to the $4,000, which is mentioned as item (e) in paragraph 14 of the plaintiff's bill, is typical of items (f) to (p), inclusive, of the same paragraph covering the following checks, in addition to that for $4,000 mentioned, which were paid by the bank on the dates below stated, the bank being recompensed by withdrawals from the Simmons savings account on the dates given, all the checks being individual checks of Kuhn without balance to meet them, and all sent to one of the brokers mentioned to make good his impaired margin account:

| $5,000. | February 13, 1931. | February 13, 1931. |
|---|---|---|
| 3,000. | February 25, 1931. | February 25, 1931. |
| 2,000. | April 8th, 1931. | April 14th, 1931. |
| 2,000. | April 23, 1931. | April 23, 1931. |
| 3,000. | April 25, 1931. | April 25, 1931. |
| 2,000. | April 29, 1931. | April 29, 1931. |
| 2,000. | May 2, 1931. | May 2, 1931. |
| 2,000. | May 23, 1931. | June 4, 1931. |
| 3,000. | May 29, 1931. | June 4, 1931. |
| 2,000. | June 5, 1931. | June 5, 1931. |
| 3,800. | June 6, 1931. | June 9, 1931. |

The two items, one of $2,000 paid by the bank May 23, 1931, and one of $3,000 paid by the bank May 29, 1931, were both covered by one withdrawal of $5,000 from the savings account June 4th, 1931. The item of $3,800 on June 6, 1931, was covered by a withdrawal from the savings account of $4,000 on June 9, 1931.

It should be noted, however, that the circumstances as shown by the evidence affecting the items subsequent to the $4,000 item are not exactly the same as those recited in connection with that item. The most important difference is in respect of the disposition of the checks when they came in. The first item of $4,000 represented by Kuhn's check for that amount was carried for at least one day by the bank as a cash item. The check was seen in the drawer by employees of the bank, and was carried on the ledger as a cash item. It does not appear that any subsequent check after payment was carried on the books as a cash item. It is clear, however, that, as soon as a check was paid by the bank in each case, it was actually carried as a cash item, or treated as such, for lengths of time varying from a part of a day, or possibly a few minutes, to about ten days, when the amount of the check paid would invariably be restored to the bank and abstracted from the Simmons savings account, with a false entry made on the books by the assistant cashier and manipulation of the withdrawal cards to conceal the transaction.

That the checks when paid were actually carried as cash items, or so treated, appears from the testimony of Miss Bailey and Miss Hoak, who say that there was no other way that they could have been carried or treated. In no case was the worthless check of Kuhn charged to his account to show an overdraft. It was always paid and held until offset by a secret withdrawal from the Simmons savings account—in most cases on the same day the check was paid, and probably often at about the same time. The assistant cashier made all necessary false entries on the books and wrote all the withdrawal slips except one. In all cases she gave the withdrawal slips to Kuhn instead of to the clerk who regularly had them for filing. It does not appear that she told any of the directors of the bank or any other person what was going on.

Miss Hoak, the clerk who had charge of the individual deposit ledger and the Federal Reserve collection letter, knew in every case where Kuhn's check came in it would largely overdraw his account if charged against it (referring, of course, to the checks in question). At his direction she gave Kuhn the checks without charging them. She asked if the cash would come right, and was satisfied upon receiving the answer that it would. Whenever one of these checks of Kuhn came in, she made notations deducting the Kuhn check from the total items of the Federal Reserve letter, and then saw the check vanish from the bank. She knew that they were not charged to Kuhn or anybody else. I do not find, however, that Miss Hoak actually knew or suspected that Kuhn was stealing from the Simmons accounts. She was young, inexperienced, and guileless. She was satisfied with the assurance of Kuhn that the "cash would come right."

Check to Fidelity Trust Company of $1211.73.

Shortly prior to November 24, 1931, Kuhn drew a check—either his personal check or a check as guardian—in the amount of $1,211.73, and sent it to the Fidelity Trust Company of Portland in payment of his own personal note. This check was received and credited by that company November 24, 1931, was sent to Boston and came to the defendant bank, with other checks from the Federal Reserve Bank, and was paid by the defendant bank November 27, 1931. It was charged to the guardian checking account December 4, 1931, the same day that $2,000 was transferred to that account from the Simmons savings account. In view of the testimony, which I have accepted as true, to the effect that no checks were charged to the guardian account that did not purport to be guardian checks, I conclude that this was such a check, either when it was sent out by Kuhn or after it came back, and was apparently a check proper to be charged to that account. At any rate, the proof is not sufficient to include this check in the category of withdrawals from the savings account to meet personal checks of Kuhn paid by the bank. It required no false entries or other manipulations such as existed in those cases. It may have been carried as a cash item from November 27th to December 4th, but not necessarily a personal item of Kuhn's.

It has been urged that this check must have been sent out as an individual check, because the trust company probably would not take a check from a trust officer in payment of his individual note. That seems to be a matter of argument, and there is no positive evidence on the point.

Payments of December 23, 1931.

On the date above mentioned, Hornblower & Weeks sold all securities remaining in their hands as collateral for the Kuhn account, and sent him a check for $3,440.16 as the balance due him. About the same time Hayden Stone & Co. closed out Kuhn's account with them and sent him a check for $4,850.55. The total amount of these two checks, together with some other money received by Kuhn for some securities sold out belonging to his father, was used by Kuhn to take up and pay certain notes, five in number, held by the defendant bank upon which Kuhn's name did not ap-

pear, but which in most of the cases were signed by persons at the instigation of Kuhn and for his accommodation. Kuhn also furnished some collateral for these notes. Included in the securities sold by Hornblower & Weeks were two bonds of the St. Louis & Southwestern Railroad which Kuhn had purchased with Simmons estate money, one for $855.28 and the other for $856.67, and a Western Union bond which Kuhn had purchased for $1,014.63; all of which bonds were left by him with the brokers for collateral security. These three bonds, when sold with the other securities, brought $1,306.78. The check received by Kuhn from Hayden Stone & Co. included the proceeds of the sale of a $1,000 United Drug bond which Kuhn had purchased with the Simmons estate money and left with that firm as collateral. That bond, which cost $966.53, brought $901.11. These figures, representing purchases of bonds used for collateral, will be recognized as withdrawals from the Simmons estate through the guardian checking account. The total amount received by Kuhn from the brokers ($8,290.71) represented principally the result of his speculative activities with the money stolen from the Simmons estate.

There was, however, a considerable debit balance against Kuhn with the brokerage firms at the time he began his thefts from Mrs. Simmons to make good his margins, and such balance was secured by sundry stocks and bonds which were sold and changed from time to time and finally all sold out with the other collateral just before the checks were sent Kuhn. It is impossible, at least without an expert audit, to determine the proportion of the whole amount paid Kuhn that was produced by the different items sold.

The notes taken up and paid by Kuhn with this money were taken by the bank in the usual course of business, without knowledge on the part of any one else that Kuhn had any personal connection with them; but as between him and the makers of the notes they were probably Kuhn's notes to pay. On the face of the transaction, they were the makers' notes to pay. There was nothing on the books to the contrary. Upon payment of these notes, they were taken by Kuhn and apparently destroyed. At least they were removed from the bank. Some of the collateral that had been put up to secure these notes was found in the bank box after Kuhn's death, but not all. The transaction by which the bank received something over $16,000 in payment of these notes and parted with the notes themselves and a portion of the collateral was wholly executed by Kuhn, including the entries on the books of amounts paid. It is impossible to determine from the evidence what collateral was taken away when the notes were paid, as the testimony of the president of the bank as to this point is not clear. No satisfactory records were produced showing either the original collateral or that remaining or substituted.

## Conclusions of Law.

The applicable principle of law under which the defendant bank can be held liable for the wrongful diversions from the Simmons account by her guardian, who was also the cashier of the bank, is that a banker who knows that a deposit with him is a trust fund cannot appropriate that fund for his private benefit, or knowingly assist another to appropriate it for his benefit, without being liable to refund the money if a breach of trust is committed by such appropriation. A participation by the banker in the wrong done to the beneficiary of the trust account is the basis of the liability, and such participation may exist with or without advantage to the bank.

In the leading case of Bischoff v. Yorkville Bank, 218 N. Y. 106, 112 N. E. 759, 761, L. R. A. 1916F, 1059, the rule is well stated as follows: "Inasmuch as the defendant [bank] knew that the credits to Poggenburg created by the proceeds of the checks were of a fiduciary character and were equitably owned by the executor, it had not the right to participate in a diversion of them from the estate or the proper purposes under the will. Its participation in a diversion of them would result from either (a) acquiring an advantage or benefit directly through or from the diversion, or (b) joining in a diversion, in which it was not interested, with actual notice or knowledge that the diversion was intended or was being executed, and thereby becoming privy to it."

The following statement of the law is quoted with approval by Judge Kenyon in Conqueror Trust Co. v. Fidelity &. Deposit Co. (C. C. A.) 63 F. (2d) 833, 838: "It is hardly necessary to state that the courts recognize that in the interest of commercial security a bank may safely deal with a depositor without undertaking to scrutinize the source of his deposits, or, even if the trust character is known, seeing to the proper application of the funds. It is well settled that a bank has the right to assume that the depositor is acting within his authority, and will deal justly by his principal; but this rule breaks down, or rather, has no application, where a bank, with knowledge of the trust character of a

deposit, assists the depositor to misapply it by appropriating it, either by a charge ticket, or through the check of the depositor, to the private obligation owed by the depositor to the bank."

Also as stated in Allen v. Puritan Trust Co., 211 Mass. 409, 97 N. E. 916, 919, L. R. A. 1915C, 518: "The principle governing the defendant's liability is that a banker who knows that a fund on deposit with him is a trust fund cannot appropriate that fund for his private benefit, or where charged with notice of the conversion join in assisting others to appropriate it for their private benefit, without being liable to refund the money if the appropriation is a breach of the trust."

In showing participation by the bank here in a wrongful diversion, Kuhn, the cashier, must be regarded, not as an agent of bank, but as operating individually and fraudulently on his own account. His action is not that of the bank and his knowledge is not notice to the bank.

The rule in ordinary cases that the principal is bound by the knowledge of his agent acquired in the course of the principal's business and while acting within the scope of his authority does not apply to the case of Kuhn, because, while committing the fraud, he stepped out of his position as cashier and acted wholly for himself and not in the interest of the bank. The presumption that knowledge acquired by the agent would be imparted to his principal disappears where it is against the interest of the agent to give the principal the information.

The following pertinent statements of the rule are quoted from Schneider v. Thompson (C. C. A.) 58 F. (2d) 94, 96:

"In Bank of Overton v. Thompson, 118 F. 798, 800, this court says, concerning the action of a cashier there involved: ' * * * His knowledge of all the facts connected with the rights of the complainant to that money is imputable to that bank, under the well-settled general rule that the knowledge of an agent, or notice to an agent, while acting within the scope of his authority, is notice to his principal, because within that scope he is the alter ego of the principal, and because the law will presume that the agent has performed his duty to disclose to his principal all notice to himself necessary to his principal's protection or guidance. The officer of a corporation, like a cashier of a bank, is such agent. There are, however, well-settled exceptions to this rule, where notice or knowledge on the part of the agent will not be imputed to the principal, and one of these is "where the agent's relations to the subject-matter, or his previous conduct, render it certain that he will not disclose it." Mechem, Ag. § 721. "In such cases the presumption is that the agent will conceal any fact which might be detrimental to his own interests, rather than that he will disclose it." ' *  * *

" 'This presents another phase of the oft-recurring question as to when and how far notice to an agent is notice to his principal. In view of the many decisions on the subject, it is unnecessary to do more than to apply them to the facts of this case. If Plant, within the scope of his office, had knowledge of a fact which it was his duty to declare, and not to his interest to conceal, then his knowledge is to be treated as that of the bank. For he is then presumed to have done what he ought to have done, and to have actually given the information to his principal.' "

I do not consider that there is liability here arising from negligence of the directors in placing Kuhn in full control of the internal machinery and operations of the bank. To establish liability on that ground, it must at least be shown that the results complained of naturally flow from want of ordinary care on the part of the directors. The boundaries of ordinary care in such a situation are necessarily very indefinite. In a small community it is not unusual, and often necessary, to run a bank more or less as a one man bank; nor does it appear that much more diligence than these directors or similar directors would be capable of exercising would have resulted in any discovery of wrongdoing.

Withdrawals from the Estate Checking Account.

Applying the above principles to the checks paid from the guardian's checking account, being items (a), (b), (c), (d), and (q) of paragraph 14 of plaintiff's bill, I can find no liability on the part of the bank. There was no "participation" on the part of the bank by receiving any benefit from the payment of the checks. They were all to other persons. The bank's assets were not used or impaired at any point, and it had no debt or claim to be made good by their payment. Neither do I think the bank can be said to have assisted in the transaction with notice that a diversion was being carried out. The first four checks were to buy bonds which, when bought, were the property of the estate. They were afterwards converted by Kuhn, but that was another matter. The other check might have been for the same purpose so far as it showed. The only irregularity that appeared was in correcting the seemingly ac-

cidentally omitted designation "guardian" on these particular checks after they came in. The color of the checks in most, if not all, cases was such as was used in the legitimate withdrawals from that account. The transactions appeared to the bookkeeper as perfectly innocent. I think they would have so appeared to the directors if they had been informed of the circumstances.

Kuhn was at that time a trusted officer and manager of the bank and highly esteemed in the community. It took expert accountants a considerable time to discover the irregularities after they were known to have occurred. Kuhn had a right to check out money as guardian, even if there had been some suspicions aroused by the circumstances. Lowndes v. City National Bank, 82 Conn. 8, 72 A. 150, 22 L. R. A. (N. S.) 408.

### Withdrawals from the Estate Savings Account.

■ In the case of these withdrawals described above, I find "participation" by the bank both through receiving benefits therefrom, to some extent, and also by assisting in the diversions through their agents with notice of the facts. This applies to items (e) to (p), inclusive, paragraph 14 of the plaintiff's bill.

As to receiving benefits; it is true, as pointed out by counsel, that the benefit came in each case only after Kuhn had caused the bank a possible loss by paying his worthless check, and that the whole thing might be called a "jugglery" in pursuance of a previously formed design by Kuhn to abstract the money from the Simmons account for his own benefit; but the benefit accruing to the bank is not the whole foundation of liability. Proof of a benefit received, even temporarily by the bank, under some circumstances, shows a participation in the transaction, which is the important point.

If the transaction is separated into its different parts, the first is the arrival at the bank of Kuhn's worthless check. Of course, the matter should have ended then and there, so far as the bank was concerned; but it did not, and the second step was the one taken by the bank in paying the check. Doing so, it acquired a claim of little or no value against its cashier, who had control of a large trust deposit. If the matter had ended there, as it also should have, the bank presumably would have lost the amount of the check, and the Simmons estate would have saved that amount.

The third and final step was the payment of the doubtful claim held by the bank with money taken from the Simmons savings account. In the last two steps Kuhn was acting for himself to perpetrate a fraud. The bank was represented by its assistant cashier, who observed the whole transaction, and by its bookkeeper, who saw significant parts of it. Thus the bank had notice of and participated in a transaction most irregular on its face and quite obviously resulting in a wrongful diversion from the trust estate. The bank benefited from step No. 3, in that it saved the loss it incurred or made probable by taking step No. 2. The nature or extent of the benefit is not of so much importance as the fact that the bank thereby participated in the wrongful act of the trust officer.

It should not be inferred that the assistant cashier, Miss Bailey, was in a conspiracy with Kuhn to steal from the Simmons estate. There is no evidence to that effect or that she benefited in any way from the transaction. She probably did not appreciate the seriousness of the action taken by herself and Kuhn, or she may have thought that it would be remedied afterward. She was concerned in knowing whether the cash would come right, and was assured by Kuhn that it would. It is enough that she assisted, during the regular course of business, in transferring money from the Simmons estate to the assets of the bank, thereby making good the deficiency caused by the payment of the worthless checks.

"Notice sufficient to attract attention, and put a party on his guard and call for inquiry is notice of everything to which such inquiry might have led." Dresser v. Bates (C. C. A.) 250 F. 525, 538.

The bank will have to account to the plaintiff for the money taken from the Simmons savings deposit from January 27, 1931, to June 9, 1931, inclusive, amounting to $33,800, and described in items (e) to (p), inclusive, in the plaintiff's bill.

### Check to Fidelity Trust Company of $1,211.73.

■ In this transaction there is no proof that the defendant bank received any benefit therefrom, or that it participated otherwise in the diversion. The only possible participation would be that of the bookkeeper in giving the check to Kuhn and calling his attention to the fact that the word "guardian" was not on it, if it was not already on it; but I regard this as insufficient. When the check was paid, it was paid as a guardian's check out of the funds to the credit of that account. In this respect, I consider this check stands as the first five checks on the guardian's account, and

that the bank cannot be charged with participation in what turned out to be Kuhn's wrongful diversion.

#### Payments of December 23, 1931.

When Kuhn received from the brokers the two checks, one for $3,440.16 from Hornblower & Weeks, and one for $4,850.55 from Hayden Stone & Co., after he was sold out by both brokers, there was included·in the checks the amount received from the sale of the four bonds which Kuhn had bought with money checked out by him from the guardian checking account. I have not held the bank liable for the withdrawal by Kuhn on his first four checks for reasons heretofore stated. The bonds purchased by this money, however, should be considered the property of the Simmons estate. The same bonds were left by Kuhn in the hands of the brokers for his own debt, but, when they came back out of innocent hands into his own, they were recoverable by.the estate as its property. The actual bonds did not come back, but the proceeds did, which is the same thing. First Nat. Bank v. Eastern Trust & Banking Company, 108 Me. 79, 79 A. 4. When Kuhn used this money, with other funds, the origin of which cannot be accurately traced, in his attempt to change the position of the bank to its advantage in respect of certain notes which had been signed by other people as accommodation for Kuhn, he was acting as sole representative of the bank. No other person knew of or had any part in the transaction or made any entries on the books. ·As cashier, he was accepting payment on some notes held by the bank from funds known by him, in part, to belong to another person. The bank apparently gave up some notes, which, might be still held against the signers if not paid, and received securities· in addition to the amount of the notes. Kuhn was not then acting solely in his own interest, but attempting to act in the interest of the bank. I think, under these circumstances, his knowledge as to the equitable ownership of the proceeds of the particular bonds mentioned would be imputed to the bank. Martin v. First National Bank Rush City (D. C.) 51 F.(2d) 840, and cases cited. Consequently the bank has among its assets $2,207.89 which belongs to the Simmons estate and which it should account for.

So far as any other part of the sums received by Kuhn from the brokers is concerned, it is obvious that, so far as it is traceable to the Simmons savings account, the defendant has already been held liable for it when taken from that account. To hold it liable again would be a duplication. As to the sum of $2,500, which was item (q) paragraph 14 of plaintiff's bill, this was taken from the estate checking account and apparently was absorbed by the brokerage accounts. At any rate, it cannot be traced to any particular securities, and I can find no liability by the bank for it.

As to interest, I think that the bank should account at the rate it paid in its savings department for the money as and when wrongfully withdrawn, as found herein; and, on the $2,207.89, from the date it was received. Costs should be paid by the defendant. A decree may be prepared accordingly.